PEBBLE LIMITED PARTNERSHIP, acting through its General Partner, PEBBLE MINES CORPORATION, Appellant,

v.

Sean PARNELL, Lt. Governor of Alaska, the State of Alaska, Division of Elections, John H. Holman, Jack G. Hobson, and Luki Akelkok, Appellees.

Council of Alaska Producers, Appellant,

v.

Sean Parnell, Lt. Governor of Alaska, the State of Alaska, Division of Elections, John H. Homan, Jack G. Hobson, and Luki Akelkok, Association of ANCSA Regional Corporations Presidents/CEO's Inc., Alaska Federation of Natives, and Pebble Limited Partnership, Appellees.

Nos. S–13059, S–13060.

Supreme Court of Alaska.

Sept. 18, 2009.

Thomas P. Amodio, Reeves Amodio LLC, Anchorage, for Appellant Council of Alaska Producers.

Michael Barnhill, Senior Assistant Attorney General and Talis J. Colberg, Attorney General, Juneau, for Appellee Sean Parnell, Lt. Governor of Alaska.

Jeffrey M. Feldman and Susan Orlansky, Feldman Orlansky & Sanders, Timothy McKeever and Scott M. Kendall, Holmes Weddle & Barcott, PC, Anchorage, for Appellees John H. Holman, Jack G. Hobson, and Luki Akelkok.

James D. Linxwiler and Michael S. McLaughlin, Guess & Rudd P.C., Anchorage, for Appellees Association of ANCSA Regional Corporation Presidents/CEO's, Inc. and Alaska Federation of Natives, Inc.

James E. Fosler, Fosler Law Group, Inc., Anchorage, for Amicus Curiae Alaska State Legislature.

Before: MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The superior court ruled that a proposed initiative relating to the regulation of large scale metallic mineral mines was constitutionally and statutorily permissible and could appear on the ballot. The parties challenging the initiative appealed that ruling, asserting that the initiative (1) would violate the constitutional prohibition against initiatives that would appropriate public assets, (2) would enact constitutionally impermissible special legislation, and (3) is invalid because its summary and cost statements are defective. Shortly after oral argument we issued an order affirming the superior court and indicating that an opinion would follow explaining our reasons for affirmance. This is that opinion.

## II. FACTS AND PROCEEDINGS

Howard S. Trickey and Matthew Singer, Jermain Dunnagan & Owens, Anchorage, for Appellant Pebble Limited Partnership.

On April 25, 2007, the Lieutenant Governor of Alaska, Sean Parnell, was presented with an application for an initiative entitled

"An Act to protect Alaska's clean water" ("07WATR"). After reviewing 07WATR, the Department of Law advised the lieutenant governor that he should not certify the initiative application. The Department of Law concluded that the initiative did not comply with the standards for initiatives laid out in AS 15.45.040 because it included "prohibited subjects" by making an appropriation of state assets through designation of the uses of public land and water. Relying on the Department of Law's advice, the lieutenant governor denied certification of initiative 07WATR.

On July 9, 2007, the sponsors of 07WATR filed suit against the lieutenant governor seeking a declaration that 07WATR met all statutory requirements for initiatives and seeking certification of the initiative. The parties filed cross-motions for summary judgment. On October 12, 2007, Superior Court Judge Fred Torrisi issued a decision and judgment concluding that 07WATR was not an appropriation and granting judgment to the sponsors. Consistent with his decision, Judge Torrisi ordered 07WATR certified, and ordered the lieutenant governor to "immediately prepare a sufficient number of sequentially numbered petitions to allow full circulation throughout the state." On January 14, 2008, the sponsors of the initiative submitted to the lieutenant governor a petition with over 30,000 signatures in support of 07WATR. The lieutenant governor then prepared a summary and cost statement for the 07WATR initiative.

On October 9, 2007, before Judge Torrisi issued his decision on 07WATR, another application for an initiative with the title "An Act to protect Alaska's clean water" ("07WTR3") was filed with the lieutenant governor. 07WTR3 reads:

THE ALASKA CLEAN WATER INITIATIVE (III)

FOR AN ACT ENTITLED

"An Act to protect Alaska's clean water."

BE IT ENACTED BY THE PEOPLE OF THE STATE OF ALASKA:

Section 1. Purpose. The purpose of this Act is to protect the statewide public interest in water quality by limiting the discharge or release of certain toxic pollutants on the land and waters of the state, and by establishing management standards and other regulatory prescriptions to ensure that Alaska's waterways, streams, rivers and lakes, an important public asset, are not adversely impacted by new large scale metallic mineral mining operations and that such prospective operations are appropriately regulated to assure no adverse effects on the state's clean waters.

Section 2. Regulatory standards affecting streams and waters.

(a) Notwithstanding any other provision of law, approvals, authorizations, licenses and permits for a prospective large scale metallic operation may not be granted or issued to a person or entity to allow activity that directly or indirectly:

(1) releases or discharges a toxic pollutant or pollutants, in a measurable amount that will effect human health or welfare or any stage of the life cycle of salmon, into, any surface or subsurface water, or tributary there to; or that

(2) stores or disposes of metallic mineral mining wastes, including overburden, waste rock, and tailings in a way that could result in the release or discharge of sulfuric acid, other acids, dissolved metals, toxic pollutants or other compounds thereof that will effect, directly or indirectly, surface or subsurface water or tributaries thereto used for human consumption or salmon spawning, rearing, migration or propagation.;

(b) This measure is intended to regulate the operations described herein to prevent the release or discharge of toxic pollutants and other chemicals into the waters of the state. This measure shall not result in the appropriation of lands or waters of the state in any fashion associated with new large scale mining operations. Use of the surface and subsurface waters and the land of the state for a prospective large scale metallic mining operation is not prohibited but is subject to regulation to ensure protection of human health, and welfare and conservation of other state re-

sources which also rely on the waters and land of the state.

Section 3. Scope. Section 2 of this Act does not apply to existing large scale metallic mineral mining operations that have received all required federal, state, and local permits, authorizations, licenses, and approvals on or before the effective date of this Act or to future operations of existing facilities at those sites.

Section 4. Savings Clause. It is the intention of the people of Alaska that each of the provisions of this Act or any portion thereof shall be independent of each of the others, so that the invalidity of any provision or portion thereof shall not affect the validity of the remaining provisions or portions thereof, and that all valid provisions and portions thereof shall be effective irrespective of the invalidity of any other provision or portion thereof. Upon enactment, the state shall take all actions necessary to ensure the maximum enforceability of this act.

Section 5. Definitions.

(a) "large scale metallic mineral mining operation" means a mining operation that extracts metallic minerals or deposits and utilizes or disturbs in excess of 640 acres of lands or waters, either alone or in combination with adjoining, related or concurrent mining activities or operations. This term includes all components of a mining project, including but not limited to:

(1) mining, processing, the treatment of ore in preparation for extraction of minerals, and waste or overburden storage or disposal;

(2) any construction or operation of facilities, roads, transmission lines, pipelines, separation facilities, and other support and ancillary facilities;

(3) any mining or treatment plant or equipment connected with the project, underground or on the surface, that contributes or may contribute to the extraction or treatment of metallic minerals or other mineral product; and

(4) any site of tunneling, shaft-sinking, quarrying, or excavation of rock for other purposes, including the construction of water or roadway tunnels, drains or underground sites for the housing of industrial plants or other facilities.

(b) "toxic pollutants" means those substances or substance combinations, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation, or assimilation into a human, fish or wildlife organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available, cause death, disease, malignancy, behavioral abnormalities, abnormalities, or malfunctions in growth, development, behavior, or reproduction, cancer, genetic mutations, physiological malfunctions or physical or physiological abnormalities or deformations in such organisms or their offspring; "toxic pollutants" includes the following substances, and any other substance identified as a toxic pollutant under 33 U.S.C. 1317(a):

2–chlorophenol; 2,4–dichloraphenol; 2,4–dimethylphenol; acenaphthene; acrolein; acrylonitrile; Aldrin/Dieldrin; ammonia; antimony; arsenic; asbestos; benzene; benzidine; beryllium; cadmium; carbon tetrachloride; Chlordane; chlorinated benzenes; chlorinated naphthalene; chlorinated ethanes; chlorine; chloroalkyl ethers; chloroform; chlorophenols; chlorophenoxy herbicides; chromium; copper; cyanide; DDT; Demeton; dichlorobenzenes; dichlorobenzidine; dichloroethylenes; dichloropropane; dichloropropene; dinitrotoluene; diphenlyhydrazine; Endosulfan; Endrin; ethylbenzene; fluoranthene; Guthion; haloethers; halomethanes; Heptachlor; hexachlorobutadiene; hexachlorocyclohexane; hexachlorocyclopentadiene; isphorone; lead; Lindane; Malathion; mercury; methoxychlor; Mirex; napthalene; nickel; nitrobenzene; nitrophenols; nitrosamines; p-dioxin; Parathion; PCBs; pentachlorophenol; phenol; phthalate esters; polynuclear aromatic hydrocarbons; selenium; silver; sulfuric acid, tetrachloroethylene; thallium; toluene; Toxaphene; trichloroethylene; vinyl chloride; and zinc[.]

The Department of Law reviewed 07WTR3 and advised the lieutenant governor to certify the initiative application. In making its recommendation, the Department of Law noted that "the differences between 07WTR3 and 07WATR highlight the line between impermissible appropriation and permissible regulation." The Department of Law also interpreted the word "effect" in section two to mean "adversely [a]ffect"[1] in order to make the initiative's substantive standards consistent with the initiative's stated purpose to "assure no adverse effects" on the state's water. In making the decision to construe the language of the initiative in this manner, the Department of Law noted that "[w]ere we to construe ['effect'] to mean 'any effect,' we would have to find this standard an impermissible appropriation." Relying on the Department of Law's advice, the lieutenant governor certified initiative 07WTR3.

The lieutenant governor prepared the following summary for the 07WTR3 initiative petition:

BILL PROVIDING FOR REGULATION OF WATER QUALITY

This bill imposes two water quality standards on new large scale metallic mineral mining operations in Alaska. The first standard does not allow such a mining operation to release into water a toxic pollutant that will adversely affect human health or the life cycle of salmon. The second standard does not allow such a mining operation to store mining wastes and tailings that could release sulfuric acid, other acids, dissolved metals or other toxic pollutants that could adversely affect water that is used by humans or by salmon. The bill defines a large scale metallic mineral mining operation to mean a metallic mineral mining operation that is in excess of 640 acres in size. The bill defines toxic pollutants to include substances that will cause death and disease in humans and fish, and includes a list of substances identified as toxic pollutants under federal law. Should this initiative become law?

The cost statement prepared by the lieutenant governor for 07WTR3 stated that, because "[t]his initiative appears to propose language that does not differ significantly from existing water quality standards," "there will not be significant fiscal impact—either revenues or costs—as a result of this initiative." On January 14, 2008, the sponsors of the initiative submitted to the lieutenant governor a petition with over 30,000 signatures in support of 07WTR3.

On November 8, 2007, the Council of Alaska Producers ("the Council") filed a complaint for declaratory and injunctive relief naming the lieutenant governor and the Division of Elections and seeking to enjoin both 07WATR and 07WTR3 from being placed on the ballot. The Council alleged that the two initiatives violated constitutional restrictions on the use of the initiative by making an appropriation and by enacting special legislation. The Council further alleged that the summaries and cost statements for both initiatives were inaccurate and misleading. On November 21, 2007, the Association of ANCSA Regional Corporation Presidents/CEO's, Inc. and the Alaska Federation of Natives, Inc. (collectively "the Association") filed a complaint for declaratory and injunctive relief naming the lieutenant governor and the Division of Elections and seeking to enjoin both 07WATR and 07WTR3 from being placed on the ballot. The Association made similar allegations to those made by the Council. On December 4, 2007, the Pebble Limited Partnership, acting through its general partner Pebble Mines Corporation ("Pebble"), filed a complaint in intervention making allegations similar to those made by the Council and the Association. The sponsors of the two initiatives also moved to intervene in the action. On December 6, 2007, the superior court consolidated the Council's action with that brought by the Association. The superior court also granted Pebble's and the sponsors' requests to intervene, and both Pebble and the sponsors were joined as parties.

On January 4, 2008, the Council, Pebble, and the Association each moved separately for summary judgment. On January 18, 2008, the sponsors and the lieutenant gover-

---

1. The Department of Law uses the phrase "adversely effect," but the grammatically correct phrasing is "adversely affect" and we adopt that phrasing.

nor each cross-moved for summary judgment.

On February 28, 2008, Superior Court Judge Douglas L. Blankenship issued a decision concluding in part that 07WATR would make an impermissible appropriation and was therefore invalid and could not be placed on the ballot, and that 07WTR3 was a permissible regulatory measure that would not make an appropriation and therefore could be placed on the ballot. In concluding that 07WTR3 would not make an appropriation, Judge Blankenship adopted the approach of the sponsors and the state and construed the references to "effects" in section two to mean "adversely affects." Judge Blankenship issued final judgment on March 12, 2008, finding that (1) "07WTR3 is not an improper appropriation," (2) "07WATR and 07WTR3 are not local or special legislation," (3) "[t]he subject matter of 07WTR3 is proper for an initiative," (4) "07WTR3 does not constitute an unlawful amendment of the Alaska Constitution," and (5) "[t]he bill summary and cost statement appearing on the 07WTR3 initiative petitions are not defective."

The sponsors appealed the portion of Judge Blankenship's decision that concluded that 07WATR would make a constitutionally impermissible appropriation. The Council and Pebble appealed portions of Judge Blankenship's decision construing 07WTR3 and concluding that 07WTR3 would not make a constitutionally impermissible appropriation, would not enact constitutionally impermissible special legislation, and that the summary and cost statement were impartial and accurate. The Association did not appeal any portion of Judge Blankenship's decision, but did respond to the sponsors' appeal. The lieutenant governor appealed Judge Torrisi's decision on 07WATR. We granted consolidation of all four appeals. The legislature has submitted a brief *amicus curiae*.

On June 6, 2008, the five parties filed a joint motion to dismiss the sponsors' appeal of Judge Blankenship's decision, to dismiss the state's appeal of Judge Torrisi's decision, to vacate Judge Torrisi's decision, to issue an order dismissing with prejudice the sponsors' complaint in the original 07WATR lawsuit, to issue an order that all parties to the dismissed cases will bear their own costs and attorneys fees, and to issue an order substituting the named parties in the sponsors' appeal. We granted the joint motion in full on June 9, 2008. As a result, the only appeal remaining before us is the appeal by the Council and Pebble of those portions of Judge Blankenship's decision construing 07WTR3 and concluding that 07WTR3 would not make a constitutionally impermissible appropriation, would not enact constitutionally impermissible special legislation, and that the summary and cost statement are impartial and accurate.[2]

We heard oral argument on June 16, 2008 and issued a dispositive order on July 3.[3]

## III. STANDARD OF REVIEW

 We review a superior court's decision on summary judgment *de novo*, drawing all inferences in favor of, and viewing the facts in the record in the light most favorable to, the non-moving party.[4] We review questions of law, including the constitutionality of a ballot initiative, using our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[5] The interpretation of the constitutional term "appropriation" is a question of law to which we apply our independent judg-

---

**2.** Subsequent to the filing of the appellant briefs in this lawsuit, the sponsors formally requested that the lieutenant governor "take such steps as are necessary to ensure that Initiative 07WATR does not appear on the upcoming election ballot." The sponsors then filed a notice of potential mootness with this court. Because, as a result of this court's June 9 order, there is no appeal of Judge Blankenship's order enjoining the placement of 07WATR on the ballot, the sponsors' request to the lieutenant governor is moot.

**3.** We attach our July 3, 2008 order as Appendix A.

**4.** *See Anchorage Citizens for Taxi Reform v. Municipality of Anchorage,* 151 P.3d 418, 422 (Alaska 2006).

**5.** *Id.*

ment.[6] When reviewing initiatives, we will "construe voter initiatives broadly so as to preserve them whenever possible. However, initiatives touching upon the allocation of public revenues and assets require careful consideration because the constitutional right of direct legislation is limited by the Alaska Constitution."[7] We use a deferential standard of review for challenges to the adequacy of a petition summary.[8] We apply a deferential standard of review for challenges to the adequacy of a petition summary and will uphold a summary unless we cannot "reasonably conclude" that it is "impartial and accurate."[9] Those attacking the summary bear the burden "to demonstrate that it is biased or misleading."[10]

## IV. DISCUSSION

Article XI, section 1 of the Alaska Constitution grants to the people the power to "propose and enact laws by initiative." This power is not without limitations, however, as article XI, section 7 of the Alaska Constitution restricts initiatives that "make or repeal appropriations" or "enact local or special legislation." Additionally, the constitution and statutory law describe the procedural steps that must be followed in order for an initiative to be placed on the ballot. Here, the opponents of the initiative argue that 07WTR3 would appropriate public assets and would enact local or special legislation, and that the summary and cost statement for 07WTR3 are defective.

## A. The Superior Court Correctly Concluded that Initiative 07WTR3 Would Not Appropriate a Public Asset.

■ Article XI, section 7 of the Alaska Constitution prohibits initiatives that "make . . . appropriations." The Council and Pebble assert that 07WTR3 would make a constitutionally impermissible appropriation by allocating or designating the use of state assets. Judge Blankenship concluded that 07WTR3 would not make a constitutionally impermissible appropriation. We use a two-part inquiry in such cases.[11] First, we determine "whether the initiative deals with a public asset."[12] Second, we determine "whether the initiative would appropriate that asset."[13]

### 1. Initiative 07WTR3 deals with a public asset.

■ Initiative 07WTR3 directly concerns the use of public land and water by large scale metallic mineral (LSMM) mines. Initiative 07WTR3 seeks to "protect the statewide public interest in water quality by limiting the discharge or release of certain toxic pollutants on the land and waters of the state." We have previously determined that public land,[14] public revenue,[15] a municipally-owned utility,[16] and wild salmon[17] are all public assets that cannot be appropriated by initiative. We have not, however, had an

6. *Staudenmaier v. Municipality of Anchorage,* 139 P.3d 1259, 1261 (Alaska 2006).

7. *Anchorage Citizens for Taxi Reform,* 151 P.3d at 422 (quoting *Pullen v. Ulmer,* 923 P.2d 54, 58 (Alaska 1996)).

8. *See Alaskans for Efficient Gov't, Inc. v. State,* 52 P.3d 732, 735 (Alaska 2002) (ballot summary).

9. *Id.*

10. *Id.*

11. *Anchorage Citizens for Taxi Reform,* 151 P.3d at 422.

12. *Id.*

13. *Id.* at 423.

14. *See Thomas v. Bailey,* 595 P.2d 1, 4–9 (Alaska 1979) (state land may not be appropriated by

initiative); *see also Alaska Action Ctr., Inc. v. Municipality of Anchorage,* 84 P.3d 989, 993–95 (Alaska 2004) (same); *McAlpine v. Univ. of Alaska,* 762 P.2d 81, 90–91 (Alaska 1988) (holding one part of initiative that would have transferred land from University of Alaska to new community college an invalid appropriation).

15. *See Thomas v. Rosen,* 569 P.2d 793, 796 (Alaska 1977) (endorsing definition of "appropriation" that involved setting aside of "public revenue").

16. *See Alaska Conservative Political Action Comm. v. Municipality of Anchorage,* 745 P.2d 936, 938 (Alaska 1987) ("A utility with $32.7 million equity is a significant municipal asset.").

17. *See Pullen v. Ulmer,* 923 P.2d 54, 61 (Alaska 1996).

opportunity to determine whether waters—in the form of "waterways, streams, rivers and lakes"—are a public asset.

In *Anchorage Citizens for Taxi Reform v. Municipality of Anchorage*,[18] we considered two criteria, either one of which, if satisfied, would qualify taxicab permits as a public asset.[19] First, we considered whether the municipality "own[ed] the underlying resource the permits authorized holders to take."[20] Second, we considered whether "issuing the permits served a regulatory rather than a revenue-raising function."[21] In that case, the taxicab permits at issue satisfied neither criterion and we concluded they were not public assets. In this case, in contrast, the waters of the state qualify as a public asset under either criterion.

 First, the state has a "property-like interest" in the waters of the state.[22] In holding that salmon are a public asset in *Pullen v. Ulmer*, we relied on article VIII of the Alaska Constitution.[23] We held that "common law principles incorporated in the common use clause impose upon the state a trust duty to manage the fish, wildlife and water resources of the state for the benefit of all the people."[24] We reasoned that "the public trust responsibilities imposed on the state by the provisions of article VIII of our constitution compel the conclusion that fish occurring in their natural state are property of the state for purposes of carrying out its trust responsibilities."[25] Because public trust responsibilities are sufficient to create a property-like interest in a natural resource, the waters of the state qualify as a public asset under the public ownership criterion identified in *Anchorage Citizens for Taxi Reform*.

Second, the waters of the state provide a revenue-raising function. In *Pullen*, we noted that "if the state's salmon population precipitously declines, the fishing industry would be devastated, causing ... harm to Alaska's economy and revenue base," and that "[t]he state benefits from the harvest of salmon through the collection of taxes imposed on business enterprises engaged in the fishery and license fees imposed on sport, personal use, and commercial fisheries."[26] This same logic certainly applies to the quality of the state's waters, with harm to these waters having the potential to—at the very least—devastate Alaska's tourism and fishing industries and significantly reduce revenues raised from related taxes and licenses. The waters of the state, therefore, qualify as a public asset due to their revenue-raising function under the test described in *Anchorage Citizens for Taxi Reform*.[27]

Because the state has a property-like interest in the waters of the state, and because the waters of the state play a revenue-raising function for the state, the waters of the state are a public asset under either factor of the *Anchorage Citizens for Taxi Reform* test.[28] Accordingly, both the land and waters of the state are public assets for the purposes of constitutional appropriations analysis, and 07WTR3 deals with public assets.

### 2. Initiative 07WTR3 would not appropriate those assets.

 On the second part of the inquiry, whether the initiative would appropriate

---

**18.** 151 P.3d 418 (Alaska 2006).

**19.** *Id.* at 424.

**20.** *Id.*

**21.** *Id.*

**22.** *Pullen*, 923 P.2d at 61; *see also Anchorage Citizens for Taxi Reform*, 151 P.3d at 424.

**23.** Article VIII provides that the legislature has the authority to "provide for the utilization, development, and conservation" of the waters of the state for the maximum benefit of the people, and reserves waters in their natural state for

common use by the people. Alaska Const. art. VIII, §§ 2, 3.

**24.** *Pullen v. Ulmer*, 923 P.2d 54, 60 (Alaska 1996) (quoting *Owsichek v. State, Guide Licensing*, 763 P.2d 488, 495 (Alaska 1988)).

**25.** *Id.* at 60–61.

**26.** *Pullen*, 923 P.2d at 59.

**27.** *See Anchorage Citizens for Taxi Reform v. Municipality of Anchorage*, 151 P.3d 418, 424 (Alaska 2006).

**28.** *See id.*

those assets, we look primarily to the "two core objectives" of the constitutional prohibition against initiatives that would make an appropriation.[29] The first objective is to prevent "give-away programs" that appeal to the self-interest of voters and endanger the state treasury.[30] The second objective is to preserve "legislative discretion by 'ensur[ing] that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs.' "[31] Our analysis of the second objective also includes consideration of whether the initiative "would set aside a certain specified amount of money or property for a specific purpose or object in such a manner that is executable, mandatory, and reasonably definite with no further legislative action."[32]

No party argues that 07WTR3 is a "give-away program."[33] We agree that 07WTR3 would not give away public assets. No provision of the initiative targets any "particular group or person or entity . . . to receive state money or property, nor is there any indication that by passing this initiative, the voters would be voting themselves money [or property]."[34] The initiative merely seeks to preserve the status quo by maintaining water quality at levels suitable for consumption by humans and for use as habitat by salmon.

The primary question before us, therefore, is whether the initiative narrows the legislature's range of freedom to make allocation decisions in a manner sufficient to render the initiative an appropriation.[35] To answer this question, we must interpret the meaning of the initiative.

Judge Blankenship's conclusion that 07WTR3 would not make a constitutionally impermissible appropriation derived from his decision to construe the language of the initiative by applying language from section one of the initiative to the substantive restrictions in section two. In distinguishing 07WTR3 from 07WATR, Judge Blankenship found 07WTR3 to be "a permissible management or regulatory policy." The Council and Pebble challenge this construction of the initiative and assert that, by its plain language, 07WTR3 would prevent any discharge or release of toxic pollutants into state waters and is therefore as proscriptive as 07WATR. The Council and Pebble then argue that under this interpretation the plain language of 07WTR3 would make a constitutionally impermissible appropriation for the same reasons Judge Blankenship cited in concluding that 07WATR would make an appropriation.

a. **The superior court did not err in construing "effect" to mean "adversely affect" in interpreting 07WTR3.**

■ In order to determine whether initiative 07WTR3 would make a constitutionally impermissible appropriation, we must first determine which interpretation of the language of the initiative is correct.

■ We have held that "the duty of a court in conducting a preelection review of an initiative is similar to the court's duty when reviewing an enacted law."[36] When interpreting a statute or municipal ordinance, we employ a sliding scale approach under which "[t]he plainer the statutory language is, the more convincing the evidence of contrary

---

**29.** *See Anchorage Citizens for Taxi Reform,* 151 P.3d at 423 (citing *Pullen v. Ulmer,* 923 P.2d 54, 63 (Alaska 1996)).

**30.** *Id.*

**31.** *Id.* (quoting *McAlpine v. Univ. of Alaska,* 762 P.2d 81, 88 (Alaska 1988)) (emphasis in original); *see also Staudenmaier v. Municipality of Anchorage,* 139 P.3d 1259, 1262 (Alaska 2006) (quoting *City of Fairbanks v. Fairbanks Convention & Visitors Bureau,* 818 P.2d 1153, 1156 (Alaska 1991)).

**32.** *Staudenmaier,* 139 P.3d at 1262 (quoting *City of Fairbanks,* 818 P.2d at 1157); *see also Pullen,* 923 P.2d at 64 n. 15.

**33.** The Alaska State Legislature, in its brief of *amicus curiae,* does argue that "07WATR gives away public resources."

**34.** *Pullen,* 923 P.2d at 63 (quoting *City of Fairbanks,* 818 P.2d at 1157).

**35.** *See id.* at 64 n. 15.

**36.** *McAlpine v. Univ. of Alaska,* 762 P.2d 81, 94 (Alaska 1988).

legislative purpose or intent must be." [37] Whenever possible, we will "construe a statute in light of its purpose," [38] and will "interpret each part or section of a statute with every other part or section, so as to create a harmonious whole." [39] And we have sought to preserve the people's right to be heard through the initiative process wherever possible:

> In reviewing an initiative prior to submission to the people, the requirements of the constitutional and statutory provisions pertaining to the use of initiatives should be liberally construed so that 'the people (are) permitted to vote and express their will on the proposed legislation....' When one construction of an initiative would involve serious constitutional difficulties, that construction should be rejected if an alternative interpretation would render the initiative constitutionally permissible. [40]

In construing the initiative's use of "effect" in section two to mean "adversely affect," Judge Blankenship looked to section one of the initiative which states that the purpose of the initiative is to insure that the state's waters "are not adversely impacted by new [LSMM] mining operations and that such prospective operations are appropriately regulated to assure no adverse effects on the state's clean waters." Although Judge Blankenship did not specifically comment on the ambiguity of the language of section two, he did observe that "[t]o infer that the initiative prohibits beneficial effects or neutral effects is at odds with common sense and the purpose of the initiative." We agree with Judge Blankenship and conclude that his interpretation of the initiative is the interpretation most consistent with the initiative's stated purpose.

When reviewing a ballot initiative that has been passed by the voters, we look "to any published arguments made in support or opposition to determine what meaning voters may have attached to the initiative." [41] This initiative has not yet been put before the voters, but over 30,000 voters signed the petition to place initiative 07WTR3 on the ballot. The summary statement provided by the lieutenant governor for this petition stated that "[t]he first standard does not allow such a mining operation to release into water a toxic pollutant that will *adversely affect* human health or the life cycle of salmon," and that "[t]he second standard does not allow such a mining operation to store mining wastes and tailings that could release sulfuric acid, other acids, dissolved metals or other toxic pollutants that could *adversely affect* water that is used by humans or by salmon." (Emphasis added.) When considered along with the language of 07WTR3's purpose statement in section one of the initiative, this language from the summary statement strongly suggests that the voters who signed the petition to place the initiative on the ballot understood the initiative to prohibit only those discharges that would adversely affect humans, salmon, and those waters used by humans or salmon.

Finally, construing the language of section two of the initiative to prohibit only "adverse effects" preserves the constitutionality of the initiative. Quoting *Anchorage Citizens for Taxi Reform*, Judge Blankenship correctly observed that we will construe a voter initiative "broadly so as to preserve [it] whenever possible." [42]

Because the conflict between the language of sections one and two of the initiative can be resolved in a manner that is consistent

**37.** *City of Kenai v. Friends of Recreation Ctr., Inc.*, 129 P.3d 452, 459 (Alaska 2006) (quoting *Gov't Employees Ins. Co. v. Graham–Gonzalez*, 107 P.3d 279, 284 (Alaska 2005)).

**38.** *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 192–93 (Alaska 2007).

**39.** *State, Dep't of Commerce, Cmty. and Econ. Dev., Div. of Ins. v. Progressive Casualty Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007) (quoting *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999)).

**40.** *Boucher v. Engstrom*, 528 P.2d 456, 462 (Alaska 1974) (quoting *Cope v. Toronto*, 8 Utah 2d 255, 332 P.2d 977, 979 (1958)), *overruled on other grounds by McAlpine v. Univ. of Alaska*, 762 P.2d 81 (Alaska 1988).

**41.** *Id.* at 193.

**42.** *Anchorage Citizens for Taxi Reform*, 151 P.3d 418, 422 (Alaska 2006) (quoting *Pullen v. Ulmer*, 923 P.2d 54, 58 (Alaska 1996)).

with the purpose of the initiative and that is most likely to preserve the constitutionality of the initiative, we hold that Judge Blankenship did not err in concluding that 07WTR3 prohibits only " 'adverse' effects."

**b. The superior court did not err in concluding that 07WTR3 would not make an appropriation.**

 All of the parties agree that if section two of 07WTR3 is read to preclude only discharges of toxic chemicals and other mine waste that cause "adverse effects" to humans, salmon, and waters used for human consumption or as salmon habitat, then 07WTR3 would not make an appropriation. We concur. We have previously noted that natural resource management is an appropriate subject for a public initiative.[43] In holding that the initiative process was not clearly inapplicable to an initiative banning the use of wolf snares, we noted that the legislative history of the drafting of the Alaska Constitution and the language of the constitution itself "evidences the delegates' intent that natural resource issues would be subject to the initiative."[44]

 Further, the prohibition against initiatives that appropriate public assets does not extend to prohibit initiatives that regulate public assets, so long as the regulations do not result in the allocation of an asset entirely to one group at the expense of another.[45] In holding that an initiative that required the Board of Fisheries to reserve a priority of wild salmon stock for personal, sport, and subsistence fisheries before allocating any stock for commercial fisheries was an impermissible appropriation, we distinguished the initiative as written from a presumptively constitutional hypothetical initiative that would simply amend "a series of

general legislative criteria to add more specific ones to guide the Board of Fisheries in its future allocation decisions."[46] Here, as Judge Blankenship observed, 07WTR3 leaves to the legislature, the Department of Environmental Conservation, and the Department of Natural Resources the discretion to determine what amounts of specific toxic pollutants may or may not be discharged at a mining site. Initiative 07WTR3—as interpreted to prohibit only discharges that "adversely affect" humans, salmon, and waters used for human consumption and as salmon habitat—therefore prohibits harm to public assets while permitting the use of public assets and exhibiting no explicit preference among potential users.

 We have long recognized that "[t]he general rule is that a court should not determine the constitutionality of an initiative unless and until it is enacted."[47] This is because "[t]he rule against pre-election review is a prudential one, steeped in traditional policies recognizing the need to avoid unnecessary litigation, to uphold the people's right to initiate laws directly, and to check the power of individual officials to keep the electorate's voice from being heard."[48] There are only two exceptions to this rule: First, where the initiative is challenged on the basis that it does not comply with the state constitutional and statutory provisions regulating initiatives—as in this case—courts are empowered to conduct pre-election review.[49] Second, courts are empowered to conduct pre-election review of initiatives where the initiative is clearly unconstitutional or clearly unlawful.[50] There is nothing clearly unconstitutional or clearly unlawful about regulating the discharge of toxic materials into state waters.

**43.** *Brooks v. Wright*, 971 P.2d 1025, 1033 (Alaska 1999) ("We find little support . . . for the proposition that the common use clause of Article VIII grants the legislature exclusive power to make laws dealing with natural resource management.").

**44.** *Id.* at 1029.

**45.** *See Pullen*, 923 P.2d at 63–64.

**46.** *Id.*

**47.** *Alaskans for Efficient Gov't, Inc. v. State*, 153 P.3d 296, 298 (Alaska 2007) (quoting *State v. Trust the People*, 113 P.3d 613, 614 n. 1 (Alaska 2005)).

**48.** *Id.*

**49.** *Id.*

**50.** *Id.*

### B. 07WTR3 Would Not Enact Special Legislation.

Pebble, the Council, and the Association argue that 07WTR3 is "special legislation" and therefore should not be placed on the ballot. The lieutenant governor and the sponsors ask us to uphold the superior court's determination that 07WTR3 would not enact "special legislation."

Article XI, section 7 of the Alaska Constitution provides in part that "[t]he initiative shall not be used to ... enact local or special legislation." That constitutional provision is echoed in AS 15.45.010: "The law-making powers assigned to the legislature may be exercised by the people through the initiative. However, an initiative may not be proposed to ... enact local or special legislation."

This court's benchmark special legislation case is *Boucher v. Engstrom.*[51] In *Boucher,* Lieutenant Governor H.A. Boucher appealed a superior court decision that enjoined an initiative from being placed on the ballot.[52] The superior court had found that the initiative, which sought to relocate Alaska's capital from Juneau to any Alaska site "west of meridian 141° west longitude" excluding Anchorage or Fairbanks, was special legislation and therefore unconstitutional under article XI, section 7 of the Alaska Constitution.[53] The superior court based this ruling on the fact that Anchorage and Fairbanks were excluded as possible relocation sites.[54] We reversed the ruling that the initiative was special legislation.

■■■ *Boucher,* considered in light of the discussion at the Alaska Constitutional Convention, establishes a two-stage analysis for determining whether proposed legislation is "local or special legislation" barred by article XI, section 7. The first stage is a threshold inquiry as to whether the proposed legislation is of general, statewide applicability.[55] In *Boucher,* we looked to the intent of the delegates to the constitutional convention regarding special legislation. We noted that the Report of the Committee on Direct Legislation, Amendment and Revision[56] stated that special laws "are of interest to only one group of people or people in only one portion of the state."[57] Thus, if we find that a proposed initiative is legislation of statewide application, we will hold that the initiative would not enact special legislation and it is not necessary to inquire further.[58]

■■■ However, if we determine that the proposed initiative is not of statewide application, we then move on to a second inquiry. In this second stage, we determine the rela-

---

**51.** 528 P.2d 456 (Alaska 1974) *overruled on other grounds by McAlpine v. Univ. of Alaska,* 762 P.2d 81, 84 (Alaska 1988).

**52.** *Id.* at 458.

**53.** *Id.* at 459, 462.

**54.** *Id.* at 459.

**55.** *See id.* at 461 ("If the subject of the statute may apply to, and affect the people of, every political subdivision of the state, it is a law of general nature ....") (quoting SUTHERLAND STATUTORY CONSTRUCTION § 40.02, at 139–40 (4th ed.1973)).

**56.** *Id.* at 461 n. 17.

**57.** *Id.* We note that, in addition to the legislative history set out in *Boucher,* constitutional history informs our understanding of the meaning of "special legislation": During the discussion that preceded the adoption of article XI, section 7, delegates to the Constitutional Convention described and gave examples of their conception of special legislation that are helpful to our inquiry. W.O. Smith expressed his view that the intent of the ban on special legislation "was to prevent the initiation of legislation affecting local areas wherein the people of the state as a whole would be allowed to vote on issues which concerned only one locality." George W. McLaughlin expanded on that idea, stating that "'local and special legislation' has a specific meaning in the law and in fact it is the expressed intent of the local government article that no local laws, that is laws of special and local effect shall be passed, but only general laws applicable to all communities." The delegates, in explaining the concept of special legislation to their colleagues, used the examples of a law that granted a divorce to one couple, an appropriation of funds for one specific school, or a prohibition of fish traps in only one particular cove. 2 Proceedings of the Alaska Constitutional Convention 1132–34 (December 19, 1955).

**58.** This is not to say that such a statute or initiative could not be challenged on other constitutional grounds, such as equal protection; however, it will be valid for purposes of article XI, section 7.

tionship between the narrow focus of the proposed legislation and the purpose of the proposed legislation. As we stated in *Boucher*, "[l]egislation, whether enacted by the legislature or by the initiative, need not operate evenly on all parts of the state to avoid being classified as local or special."[59] Therefore, we address "the reasonableness of the regulation or the classification of the subject matter."[60] We analogized this second inquiry to the "rational basis" review we employed in equal protection cases at that time.[61]

■ In *State v. Lewis*,[62] we updated this standard: the inquiry in this second stage assesses whether the legislation "bears a 'fair and substantial relationship' to legitimate purposes."[63]

In *Boucher*, we held that an initiative was not to be classified as special or local legislation merely because it "operated on 'only a limited number of geographical areas, rather than being widespread in its operation throughout the state.' "[64] Rather, such a finding of limited applicability meant that the

inquiry must move to a second stage, in which the reasonableness of the limited scope was to be scrutinized: "the test of constitutionality of the subject initiative is not whether Anchorage and Fairbanks were treated differently, but rather whether there is a reasonable basis for the disparity in treatment."[65] In the end, we concluded that "[t]he initiative's exclusion of Anchorage and Fairbanks was not arbitrary, but was premised on the view that the new capital should be a planned capital and one that should not be located in the relatively heavily urbanized areas of Anchorage and Fairbanks."[66]

In *State v. Lewis*, we considered whether legislation enacting a three-way exchange of land between the State of Alaska, the United States Government, and a Native corporation violated the prohibition against enactment of local and special acts under article II, section 19 of the Alaska constitution.[67] Plaintiffs argued that the statute violated the constitutional prohibition on local and special legislation because it affected only a limited geo-

59. *Boucher v. Engstrom*, 528 P.2d 456, 463 (Alaska 1974).

60. *Id.* at 461 (quoting SUTHERLAND, *supra* note 55, at § 40.02).

61. *Id.* (noting that "the critical element is whether there is a rational basis for the particular classification .... the classification must bear a reasonable and proper relationship to the purpose of the act and the problem sought to be remedied.").

62. 559 P.2d 630 (Alaska 1977).

63. *Id.* at 643 and n. 44 (modifying the special legislation test described in *Boucher* in order to reflect more stringent equal protection standard set forth in *Isakson v. Rickey*, 550 P.2d 359, 361–63 (Alaska 1976)). It may be useful to clarify how this test relates to our recent opinion in *Bridges v. Banner Health*, 201 P.3d 484 (Alaska 2008). *Bridges* quotes with approval a treatise stating that " '[a] statute is unconstitutional special legislation if (1) it creates [a] totally arbitrary and unreasonable method of classification, or (2) it creates a permanently closed class.' " *Id.* at 494 (quoting 2 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 40.1, at 213 (6th ed.2000)). Due to the use of "or" rather than "and" in that formulation, it might create some uncertainty about the structure of our special legislation test. Despite the quoted language, creation of a "permanently closed class" does not necessarily constitute prohibited special legislation if the legisla-

tion bears a fair and substantial relationship to legitimate public purposes. Nor does the inquiry reach the question of a fair and substantial relationship if the law in question is of general applicability.

Nevertheless, the outcome in *Bridges* was consistent with the two-step analysis we have outlined here. In *Bridges*, we found the statute in question was a general act because it "applies uniformly to any entity that seeks to construct an independent diagnostic testing facility.... [T]he class covered by the statute will grow if additional health care providers seek to construct independent diagnostic testing facilities." *Bridges*, 201 P.3d at 495. In *Bridges*, we upheld the statute on that basis, noting that we did not reach the issue of a fair and substantial relationship to legitimate purposes because the appellant did not raise that issue. *Id.* at 494–95. We might have better said that this second issue was not reached because the legislation in question was, under our threshold test, found to be a law of general applicability.

64. *Id.* (overturning *Walters v. Cease*, 394 P.2d 670 (Alaska 1964)).

65. *Id.* at 462–63 n. 22.

66. *Id.* at 464.

67. 559 P.2d at 632–33.

graphic region of the state.[68] Because the statute did in fact deal with only a limited region, we scrutinized the reasonableness of that limited scope, finding the statute valid because it was

> designed to facilitate statewide land use management and to resolve a host of pressing legal issues arising in the context of [the Alaska Native Claims Settlement Act]. The conflict between [the Native corporation] and the government concerning the adequacy of withdrawals for Native selection implicated both future state selections and existing state patents. Clouds on title could have resulted in protracted litigation and impaired effective planning for a variety of state needs.[69]

Accordingly, we found "a 'fair and substantial relationship' between permissible legislative purposes and the means used to advance them." [70]

We applied this two-stage inquiry again in *Baxley v. State*,[71] where we considered the constitutionality of a statute that allowed for the modification of four oil and gas leases in the Northstar Oil Field.[72] We found that the statute focused on a single entity, and thus failed the first inquiry: It was not a law of general or statewide application.[73] We then proceeded to the second inquiry, and found that because the specific leases in question were substantially different from any other oil and gas leases, the statute's modification of these specific leases "fairly and substantially relate[d] to legitimate state purposes." [74] Thus, because the statute satisfied the second inquiry the legislation was not special legislation.[75]

 Turning to 07WTR3, we look first to whether the subject matter is of statewide application. We find that it is. The initiative proposes new regulation on pollutant discharges from "new large scale metallic mining operations." It defines "large scale metallic mining operation" as a mining operation "that extracts metallic minerals or deposits and utilizes or disturbs in excess of 640 acres of lands or waters, either alone or in combination with adjoining, related or concurrent mining activities or operations." It is not by its terms limited to a particular area or community of the state, but would apply to any such mine anywhere in the state.

Pebble fails to present any evidence to support its assertion that this initiative is not of statewide application. Pebble contends that the initiative applies only to the Pebble and Donlin Creek mines. However, 07WTR3 does not specifically relate only to the Pebble and Donlin Creek mines. Indeed, the Council and the Association intervened in this matter because they believe that 07WTR3 has greater implications beyond the Pebble and Donlin Creek mines. Although the Pebble and Donlin Creek mines may be the only proposed mines currently affected by 07WTR3, the language of the initiative is sufficiently broad that it would apply to any new LSMM mines.

Since 07WTR3 proposes legislation of statewide application, it is not necessary for our decision here to determine whether it has a "fair and substantial relationship" to legitimate state purposes. We nevertheless note that if the initiative were evaluated under the test, it would pass muster. The initiative's stated purpose is "to protect the statewide public interest in water quality by limiting the discharge or release of certain toxic pollutants on the land and waters of the state."

Like the location of the state capital in *Boucher*,[76] the issue of water quality affects all Alaskans; declines in water quality affect the availability of water for uses including human consumption, agriculture, and habitat

---

68. *Id.* at 642.

69. *Id.* at 643.

70. *Id.* at 644.

71. 958 P.2d 422 (Alaska 1998).

72. *Id.* at 424.

73. *Id.* at 430 (noting that relevant inquiry was the one required "when the legislature has singled out an area or group").

74. *Id.* at 431.

75. *Id.*

76. 528 P.2d 456, 464 (Alaska 1974).

for fish and wildlife. And there is a strong statewide interest in protecting the fishing industry. As we establish above in part IV. A.1., public land and water are public assets in which the state has an interest. And this initiative serves a much broader interest than that of the land exchange at issue in *Lewis*, which we found to be of statewide interest even though it only directly affected a particular land deal.

Pebble also asserts that the initiative fails the "fair and substantial relationship" test because it is "grossly underinclusive and there is no good reason for this underinclusive classification." Pebble argues that the initiative is impermissibly underinclusive because it treats "(1) existing mines different[ly] from prospective mines, (2) non-metallic mines different[ly] from metallic mines, (3) 640 acre mines different[ly] from 639 acre mines, and (4) mines different[ly] from all other potential polluters."

■ However, we agree with the lieutenant governor that "legislatures routinely must draw lines and create classifications." As the United States Supreme Court has noted in the equal protection context, "we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' that a legislature need not 'strike at all evils at the same time,' and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" [77] Treating existing uses differently from new uses is a fairly routine legislative practice known as "grandfathering" that can be readily justified in terms of enhancing compliance, avoiding economic disruption, and protecting settled expectations and investments. Thus, we have noted in the equal protection context that "[a]cts conferring 'grandfather rights'

have generally withstood equal protection challenges." [78] As for distinguishing metallic from non-metallic mines, the sponsors point out that there is a policy basis for paying special attention to metallic mining because it poses its own characteristic risks, such as the high toxicity of metallic discharges for fish populations. The National Research Council has noted that "different types of exploration and different types of mining and processing present different levels of environmental risk" and require differing regulatory approaches.[79] We do not consider it arbitrary to draw a line based on mine size either. Legislation often draws lines based on size or quantity (such as income tax brackets). It stands to reason that larger mines pose greater pollution risks than smaller ones and might be subject to greater regulation. Nor is it unconstitutional to single out the mining industry in a regulatory initiative. The fact that the initiative is limited to a particular industry makes it no more constitutionally suspect than Alaska's Title 27, which also singles out mining, or Title 17, which singles out food and drugs.

Because on its face 07WTR3 is of general statewide applicability, we conclude that it is not prohibited special or local legislation. Although this alone is determinative on the question of whether it is barred under article XI, section 7, we also conclude that the initiative's provisions bear a fair and substantial relationship to legitimate state purposes.

### C. The Superior Court Correctly Concluded that the Summary and Cost Statement Are Not Defective.

The Alaska Constitution and Alaska statutes require the lieutenant governor, after certifying an application for an initiative, to prepare a true and impartial summary of the proposed initiative and an estimate of the

**77.** *Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (internal citations omitted).

**78.** *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1267 (Alaska 1980).

**79.** NATIONAL RESEARCH COUNCIL, HARDROCK MINING ON FEDERAL LANDS, 67 (1999), *available at* http://books.nap.edu/catalog.php?record_id=9682, (follow "Full Text" hyperlink). The report notes

that "[i]f not mitigated through regulation and prevention strategies, hardrock mining can have long-term impacts on ... water chemistry, aquatic biota, and aquatic habitat." *Id.* at 153. Problems associated with metallic hardrock mining include discharge of metals, cyanide, and acid drainage. *Id.* at 153–56. It notes that even "very low concentrations" of metals can be harmful to fish. *Id.* at 159.

cost to the state of implementing the proposed law. Judge Blankenship concluded that the lieutenant governor's summary and cost statement for 07WTR3 satisfied these requirements. The Council contends that the court erred in reaching that conclusion because the summary and cost statements were inaccurate, incomplete, and misleading. We disagree.

### 1. The summary statement

██ The superior court concluded that the "ballot and petition summary for 07WTR3 is a fair, true, neutral, and impartial explanation of the main features of the initiative's contents." The Council argues that Judge Blankenship's conclusion is in error because the summary is inaccurate and misleading. Specifically, the Council asserts that the summary "states that the provisions of 07WTR3 apply only to 'new' LSMM mining operations, when it in fact applies to existing LSMM mining operations that either (1) require any additional permit, or permit renewal or amendment, or (2) build an additional facility or expand operations." The Council also argues that the summary "states that [the initiative] includes the same list of toxic pollutants as found in federal law, when in fact [the initiative] adds an additional substance, sulfuric acid, that is not on the federal list." The sponsors respond by arguing that the Council waived its specific arguments about the deficiency of the summary statement by not raising them in the superior court. The sponsors further assert that even if the Council did not waive its arguments, (1) the Council's argument that the initiative applies to existing LSMM operations lacks merit because the Council has not shown that specific existing mines will be subject to

07WTR3, and (2) the Council's argument that the summary's description of toxic pollutants is misleading lacks merit because the summary explicitly mentions that the initiative prohibits storing materials that could release sulfuric acid.

██ Article XI, section 3 of the Alaska Constitution provides that after certification of an initiative application, "a petition containing a summary of the subject matter shall be prepared by the lieutenant governor for circulation by the sponsors." Alaska Statute 15.45.090(a)(2) requires that the lieutenant governor's summary of the petition be "an impartial summary of the subject matter of the bill." Alaska Statute 15.45.180(a) likewise requires that the actual ballot contain "a true and impartial summary of the proposed law." [80]

██ We explained in *Alaskans for Efficient Government, Inc. v. State*[81] that "the basic purpose of the ballot summary is to enable voters to reach informed and intelligent decisions on how to cast their ballots." [82] A summary should be "complete enough to convey an intelligible idea of the scope and import of the proposed law" and "ought to be free from any misleading tendency, whether of amplification, of omission, or of fallacy." [83] "The summary need not recite every detail of the proposed measure," [84] but "if the information would give the elector 'serious grounds for reflection' it is not a mere detail, and it must be disclosed." [85]

We apply a deferential standard of review for challenges to the adequacy of a lieutenant governor's petition summary and will uphold a summary unless we cannot "reasonably conclude" that it is "impartial and accu-

---

**80.** The superior court recognized that "[i]n practice, the lieutenant governor uses the same summary for both the petition and the ballot." The standards for the adequacy of the summary apply equally whether it is a ballot summary or petition summary.

**81.** 52 P.3d 732 (Alaska 2002).

**82.** *Id.* at 735–36 (holding that the petition summary at issue "fails to adequately describe the actual changes that the relocation initiative proposes to make and casts the initiative's purpose in an unnecessarily negative light").

**83.** *Id.* at 734 (quoting *Burgess v. Alaska Lieutenant Governor*, 654 P.2d 273, 275 (Alaska 1982)).

**84.** *Id.* at 736. *See also Burgess*, 654 P.2d at 276 (holding that Alaska Constitution and state law "do not require the lieutenant governor to give 'special' reminders to the voters regarding the scope of a state initiative").

**85.** *Alaskans for Efficient Gov't Inc. v. State*, 52 P.3d 732, 736 (Alaska 2002) (quoting *Gaines v. McCuen*, 296 Ark. 513, 758 S.W.2d 403, 406 (1988)).

rate." [86] Those attacking the summary bear the burden "to demonstrate that it is biased or misleading." [87]

Here, the lieutenant governor's summary for 07WTR3 states:

> This bill imposes two water quality standards on new large scale metallic mineral mining operations in Alaska. The first standard does not allow such a mining operation to release into water a toxic pollutant that will adversely affect human health or the life cycle of salmon. The second standard does not allow such a mining operation to store mining wastes and tailings that could release sulfuric acids, other acids, dissolved metals or other toxic pollutants that could adversely affect water that is used by humans or by salmon. The bill defines a large scale metallic mineral mining operation to mean a metallic mineral mining operation that is in excess of 640 acres in size. The bill defines toxic pollutants to include substances that will cause death and disease in humans and fish, and includes a list of substances identified as toxic pollutants under federal law.

Because the Council did not raise the specific arguments at the superior court level that (1) the summary is misleading for failing to indicate that it applies to certain existing LSMM mining operations, or (2) the summary is misleading in its description of toxic pollutants, it waived these new arguments.[88]

■ Even if the Council had not waived its arguments by failing to present them to the superior court, the arguments would still be without merit. The Council alleges that the summary is defective because (1) it fails to adequately describe all the mining operations to which it applies, and (2) its descrip-

tion of prohibited toxic pollutants is misleading. We deal with each argument in turn.

In regard to the first argument, the summary states that the initiative's water quality standards apply to "*new* large scale metallic mineral mining *operations.*" (Emphasis added.) This statement provides an "intelligible idea" of the scope and import of the initiative, which explicitly states that it "does not apply to existing large scale metallic mineral mining operations that have received all required federal, state, and local permits, authorizations, licenses, and approvals on or before the effective date of this Act *or to future operations of existing facilities at those sites.*" (Emphasis added.) The brevity required for a summary prevents a more specific and detailed description of the initiative's scope than that provided by the lieutenant governor. As we have stated, "[t]he summary need not recite every detail of the proposed measure." [89] Here, the summary adequately discloses the important details of the initiative. Thus, the Council fails to meet its burden of showing that the summary is misleading based on its description of the initiative's scope.

■ The Council's second argument is that the summary's description of toxic pollutants is misleading. Even if it had not been waived, this argument would likewise be without merit. The Council's argument that the summary misleads voters by not mentioning that sulfuric acid was added to the initiative's list of toxic pollutants ignores the explicit statement in the summary that the initiative "does not allow ... a [new] mining operation to store mining wastes and tailings that could release *sulfuric acid ....*" Because the summary is explicit in its inclusion of sulfuric acid as a prohibited toxic pollutant "that could adversely affect water that is

86. *Id.* at 735 (quoting *Faipeas v. Municipality of Anchorage,* 860 P.2d 1214, 1217 (Alaska 1993)).

87. *Burgess,* 654 P.2d at 276.

88. *See Still v. Cunningham,* 94 P.3d 1104, 1111 (Alaska 2004) ("Issues that are not raised in the superior court are waived and cannot be asserted on appeal as grounds for overturning a judgment."). The Council's argument before the superior court was that the summary was misleading because it did not state that the initiative

would end all LSMM mining. The superior court correctly rejected this original argument because, by its terms, the initiative does not ban all LSMM mining: (1) existing mines with all required permits are not affected, and (2) new mines will also be able to operate if they can do so without adversely affecting human drinking water or salmon life cycles.

89. *Alaskans for Efficient Gov't,* 52 P.3d at 736.

used by humans or salmon," it is not misleading.

The Council fails to meet its burden of showing the inadequacy of the summary prepared by the lieutenant governor for 07WTR3. The summary provides an accurate depiction of the scope and substance of the initiative. Thus, the superior court correctly concluded that it was "a fair, true, neutral, and impartial explanation of the main features of the initiative's contents."

### 2. The cost statement

The superior court concluded that "the cost statement for 07WTR3 is impartial and accurate to enable voters to make an informed decision." The court explained that although "new regulations probably will be promulgated to implement [the initiative]," these "regulations may be little different than current water quality standards," and "[t]his suggests that the state would incur few additional costs to implement the program and mining companies would be able to obtain the necessary permits to operate." The Council argues that the "cost statement for 07WTR3 is defective because it fails to consider the cost of developing and adopting regulations that will be necessary to implement the measure." The Council also asserts that "[t]here is ... likely to be substantial cost to the State in defending, in court, any regulations which it adopts." The sponsors respond that the Council waived its arguments about the cost statement because it did not make the same specific arguments when challenging the accuracy of the cost statement in the superior court. The sponsors also argue that the cost statement is valid because "even if state employees do need to review existing regulations and develop and implement some new ones, DNR's estimate of 'no significant fiscal impact' is

wholly reasonable." Finally, the sponsors assert that "[j]udicial review of the Lieutenant Governor's cost estimate should be extremely deferential."

Alaska Statute 15.45.090(a)(4) states that each petition must contain "an estimate of the cost to the state of implementing the proposed law." Although there is no Alaska case law interpreting the cost statement provision, other state courts have held that review of an initiative or referendum's cost statement should be deferential.[90]

The Alaska Department of Natural Resources (DNR) prepared the following cost statement for 07WTR3:

> This initiative appears to propose language that does not differ significantly from existing water quality standards. Therefore, the department does not foresee any significant impact on the department or on activities on state-owned land. As a result, there will not be significant fiscal impact—either revenues or costs—as a result of this initiative.

The sponsors are correct that the Council waived its argument about the cost of promulgating regulations because the Council failed to make this argument to the superior court.[91] In its motion for summary judgment, the Council merely argued that the cost statement was inadequate because it failed "to estimate the cost of [defending against] takings claims" and failed "to recognize the potential loss in State revenues that would result from the implementation of the measure." The "potential loss" in revenues referred to the speculative loss of revenues if the initiative ended all LSMM mining. Because the initiative would not end all LSMM mining and the cost of defending takings claims is a purely speculative cost that assumes future lawsuits, the superior court was correct to conclude that the cost statement

**90.** *See, e.g., Advisory Opinion to the Attorney General re Referenda Required for Adoption,* 963 So.2d 210, 214 (Fla.2007) ("In deciding the validity of a financial impact statement, the Court has limited itself only to address whether the statement is clear, unambiguous, consists of no more than seventy-five words, and is limited to address the estimated increase or decrease in any revenues or costs to the state or local governments."); *Stop Over Spending Montana v. State,* 333 Mont. 42, 139 P.3d 788, 793 (2006) (uphold-

ing cost statement even though "[t]he fiscal note says that the fiscal impact of the measure is unknown"); *Bassien v. Buchanan,* 310 Or. 402, 798 P.2d 667, 669 (1990) (holding that failure of government officials to file statutorily-required fiscal impact estimates for initiatives did not prevent a valid vote on the measures).

**91.** *See Still,* 94 P.3d at 1111.

was valid. The new argument made by the Council in its appellate brief that the DNR misstated the cost of adopting new regulations is waived because the Council failed to raise the argument in the court below.[92]

Even if the Council had not waived its argument that the cost statement is inadequate because it omits the cost of adopting new regulations, that argument would still be without merit. The cost statement statute merely requires an "estimate" of the cost of implementing the proposed law. Thus, the cost statement need not document every conceivable cost associated with the implementation of the law. In addition, the DNR has substantially more knowledge about the relative costs of developing necessary regulations than the parties or this court, particularly in this instance, where there is no evidence before us of the costs of implementing the regulations that would be required by 07WTR3. Thus, we defer to the DNR's expertise in this area and uphold its reasonable conclusion that there will not be any substantial fiscal impact as a result of the initiative.

 The Council did not waive its second argument challenging the cost statement—that the cost statement omits costs associated with legal challenges to regulations that the initiative will require—because it made a similar argument at the superior court level. Nonetheless, this argument is without merit. Although it is possible that companies planning to begin new mining operations may bring legal challenges against the state based on the initiative, those potential lawsuits and the costs associated with them are purely speculative. There is no authority for the assertion that the estimated costs of defending potential lawsuits involving the initiative must be described in the cost statement. Because such costs are purely speculative, it would be impracticable to provide an estimate of how much they would be. Therefore, the superior court reasonably concluded that the cost statement is not inaccurate on this ground.

In sum, the cost statement provides an accurate estimate of the likely insignificant costs associated with implementation of the initiative. Thus, we affirm the superior court's determination that the cost statement is not defective.

## V. CONCLUSION

For the reasons set out in this opinion, in our order of July 3, 2008 we AFFIRMED the superior court's interpretation of 07WTR3 and its conclusions that the initiative would not make a constitutionally impermissible appropriation and would not enact constitutionally impermissible special legislation, and that the initiative's summary and cost statement are not deficient. And because 07WTR3 does not appropriate a public asset, because it is not special legislation, and because its summary and cost statement are not defective, we AFFIRMED the decision of the superior court in all aspects.

FABE, Chief Justice, not participating.

### APPENDIX A

### THE SUPREME COURT OF THE STATE OF ALASKA

Pebble Limited Partnership, Appellant,

v.

Sean Parnell, Lt. Governor, et al., Appellees.

Council of Alaska Producers, Appellant,

v.

Sean Parnell, Lt. Governor, et al., Appellees.

Supreme Court No. S–13059

Supreme Court No. S–13060 (Consolidated)

**Order**

**Affirming Superior Court**

**Order No. 62–July 3, 2008**

Trial Court Case # 4FA–07–2696 CI

Before: Matthews, Eastaugh, Carpeneti, and Winfree, Justices.

[Fabe, Chief Justice, not participating.]

In October 2007 an application for an initiative with the title "An Act to protect Alaska's clean water" was filed with the lieutenant governor ("07WTR3"). This was the third attempt to place an initiative on the

92. *Id.*

ballot that would restrict or regulate the discharge of toxic materials from large scale metallic mineral mines in Alaska. The Department of Law reviewed 07WTR3 and advised the lieutenant governor to certify the initiative application. Relying on the Department of Law's advice, the lieutenant governor certified initiative 07WTR3. The lieutenant governor then prepared a summary and cost statement for the initiative that incorporated the Department of Law's interpretation. In January 2008 the sponsors of the initiative submitted to the lieutenant governor a petition with over 30,000 signatures in support of 07WTR3.

In November and December 2007 the Council of Alaska Producers, the Pebble Limited Partnership, and the Association of ANCSA Regional Corporation Presidents/CEO's, Inc. and the Alaska Federation of Natives, Inc., filed suit in the superior court seeking a declaration that 07WTR3 violated constitutional and statutory restrictions on legislation by initiative, and an injunction that would prevent placement of the initiative on the ballot. The sponsors of the initiative intervened in the action.

In February 2008 Superior Court Judge Douglas L. Blankenship issued a decision concluding that 07WTR3 was a permissible regulatory measure and not an appropriation and was therefore appropriate for the ballot. In concluding that 07WTR3 was not an appropriation, Judge Blankenship adopted the approach of the sponsors and the state and construed the references to "effects" in section two as meaning "adversely affects." Judge Blankenship found in his final judgment that (1) "07WTR3 is not an improper appropriation;" (2) "07WTR3 [is] not local or special legislation;" (3) "[t]he subject matter of 07WTR3 is proper for an initiative;" (4) "07WTR3 does not constitute an unlawful amendment of the Alaska Constitution; and" (5) "[t]he bill summary and cost statement appearing on the 07WTR3 initiative petitions are not defective."

The Council of Alaska Producers and the Pebble Limited Partnership appealed those portions of Judge Blankenship's decision construing 07WTR3 and concluding that

07WTR3 would not make a constitutionally impermissible appropriation, would not enact constitutionally impermissible special legislation, and that the summary and cost statement are impartial and accurate. The Association of ANCSA Regional Corporation Presidents/CEO's, Inc. and the Alaska Federation of Natives, Inc. did not appeal any portion of Judge Blankenship's decision. We heard oral argument on June 16, 2008.

**IT IS ORDERED:**

1. Judge Blankenship did not err in construing the initiative broadly and reading the initiative's use of "effects" in section two to mean "adversely affects."

2. Judge Blankenship did not err in concluding that 07WTR3 would not make a constitutionally impermissible appropriation.

3. Judge Blankenship did not err in concluding that 07WTR3 would not enact constitutionally impermissible special legislation.

4. Judge Blankenship did not err in concluding that the summary and cost statements are not defective.

5. Accordingly, the decision of the superior court declining to enjoin the placement of initiative 07WTR3 on the ballot is AFFIRMED.

6. This court will issue a written opinion at a future date explaining the reasons for this result.

7. Preparation of the ballots including initiative 07WTR3 need not await publication of this court's opinion.

Entered by direction of the court.

Clerk of the Appellate Courts

/s/ Marilyn May