Will Key **JEFFERSON**, Appellant,

v.

**STATE** of Alaska et al., Appellees.

No. 2000.

Supreme Court of Alaska.

Sept. 27, 1974.

Will Key Jefferson, in pro. per.

John R. Spencer, City Atty., and Vincent P. Vitale, Asst. City Atty., Anchorage, for appellee, City of Anchorage.

Gary Thurlow, Borough Atty., and Denison Lane, Asst. Borough Atty., Anchorage, for appellee, Greater Anchorage Area Borough.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, Justices.

## OPINION

FITZGERALD, Justice.

Will Key Jefferson brought suit for injunctive and declaratory relief against the State of Alaska, the Greater Anchorage Area Borough, and the City of Anchorage. His complaint consisted of a welter of allegations which makes a logical analysis and treatment difficult.[1] The essence of the matter appears to be that the Borough had illegally taken over operation and control of the sewer system of the City of Anchorage, thereby harming Jefferson, a resident and taxpayer in the city.

Some discussion of the factual background of this suit is necessary. In 1966 the Borough held an election in which the following proposition was voted upon by Borough voters:

"Shall the [Borough] exercise on an areawide basis the powers and functions concerning sewers, including the operation and maintenance of sanitary sewers and sewage treatment facilities, given to cities of the first class under the laws of the State of Alaska?"

The proposition was approved by the voters.[2]

Following the election, the Borough and City entered into negotiations to transfer

---

1. Alaska R.Civ.Pro. 8 provides that a complaint shall contain "a short and plain statement of the claim" showing that the complainant is entitled to relief.

Professor Wright notes, in regard to the similar federal rule, that the requirement "of a short and plain statement of claim . . . [has] been held to be violated by needlessly long, repetitious, or confused complaints." 5 C. Wright & A. Miller, Federal Practice & Procedure (Civil) § 1217, at 128 (1969) (footnotes omitted).

2. Passage of the proposition was attested to by the Borough Clerk in an affidavit, and Jefferson has introduced no evidence to the contrary.

the City's sewer system and related assets to the Borough. Extended discussions produced a final agreement as to the terms of the transfer in February of 1970. The agreement was approved by the city council of the City and the assembly of the Borough. Pursuant to that agreement, the Borough has taken control and operation of the City's sewer system as well as its own. In December of 1970 Jefferson brought this suit to enjoin transfer of control to the Borough.

■■ The Borough[3] moved for summary judgment, urging that the suit could be resolved as a matter of law because there were no genuine issues of material fact to be determined at a trial. The trial court entered summary judgment in favor of the Borough, City and State, and Jefferson has appealed. Jefferson's allegations may fairly be summarized to include two principal contentions. He urges that the Borough's

assumption of the City sewer system was illegal because the Borough is not a legal municipal corporation, and because the City's charter prohibits transfer of municipally owned utilities without an election in which such a transfer is approved by a three-fifths vote.[4]

## BOROUGH AS LEGAL ENTITY

■ Jefferson argues that the Borough is not a legal entity, and thus lacks the capacity to exercise powers under the state's municipal code,[5] because the statutes under which it was incorporated are unconstitutional.[6]

■ The Borough responds that Jefferson, as a private person, cannot litigate the issue of the Borough's *de jure* existence, i. e. that he can only inquire into the Borough's *de facto* existence.[7] While we are in general agreement with this contention,[8] we believe it misses the criti-

---

3. The City and State joined in the motion.

4. Jefferson also assigned error to the entry of summary judgment at a time when, he alleges, genuine issues of material fact exist. Such an assignment of error is, of course, too general to be considered by this court. It is in fact not a specification of error but rather a conclusory claim that the judgment is incorrect. Appellant has the burden of directing our attention to specific errors in the proceedings below; this court will not comb the record to seek out errors on behalf of the appellant.

Jefferson discusses some points in his brief which are not covered by his statement of points on appeal. Because they were not specified and because they have no merit, we will not deal with them in this opinion.

Jefferson also attacks an award of attorneys' fees to the Borough, but we find no record of any order having been entered awarding fees.

5. The governing code at the time this suit was initiated was Title 7 of the Alaska Statutes, entitled "Boroughs", and Title 29, entitled "Municipal Corporations." These titles have been repealed and replaced by Title 29, entitled "Municipal Government." Chapter 118, S.L.A.1972.

6. The general rule is that a municipal corporation may have a *de facto* existence which is sufficient to enable it to exercise municipal powers even though it has not complied with

all of the technical requirements for incorporation. Where, however, there is not a valid law on which to base an incorporation, there can be no *de facto* existence and no valid exercise of municipal powers. 1 C. Antieau, Municipal Corporation Law §§ 1.03, 1.08 (1973).

7. A *de jure* corporation is simply one which has complied with all of the legal requirements necessary to incorporate. A *de facto* corporation, municipal or otherwise, is one which has been defectively incorporated through oversight or mistake, but which has been operating as a corporation in good faith. *See* 1 E. McQuillin, Municipal Corporations § 3.45 (3rd rev. ed. 1971); C. Rhyne, Municipal Law § 2–21 (1957).

8. We note the possibility that a private party can attack the *de jure* existence of a municipal corporation in a *"quo warranto"* proceeding brought in the name of the state upon a showing that the interest of the private party in the action is substantially greater than that of the public generally and that the attorney general of this state will not bring such an action. Port Valdez Co., Inc. v. City of Valdez, Op. No. 1044, 522 P.2d 1147 (Alaska, 1974), *interpreting* AS 9.50.310. *Cf.,* People ex rel. Bowman v. Alaska Airlines, Inc., 108 F.Supp. 274, 14 Alaska 85 (D. Alaska 1952), rev'd on other grounds, 206 F. 2d 203, 14 Alaska 363 (9th Cir. 1953).

cal point of Jefferson's argument, that the defect alleged here is so serious that the Borough could not attain even *de facto* corporate existence.

In Port Valdez Co., Inc. v. City of Valdez, Op. No. 1044, 522 P.2d 1147 (Alaska 1974), this court enumerated the elements of an effective defense of *de facto* incorporation:[9]

1) a constitutional or statutory provision under which the incorporation might lawfully have been accomplished;

2) an attempted compliance in good faith with the provision(s);

3) a colorable compliance with the provision(s);

4) An assumption in good faith of municipal powers by the corporation.

■ Jefferson's challenge arises under the first of these elements. He asserts there was no valid constitutional or statutory provision under which the incorporation could have been accomplished.[10] The trial court ruled that the Borough had obtained *de facto* status, thereby ruling implicitly that the statutes under which the Borough was incorporated were constitutional.

The Borough was incorporated pursuant to Chapter 52 S.L.A.1963. That act provided in part that should the Anchorage Election District #8 fail to incorporate under the local option provisions of A.S. 7.10.010–.140 by January 1, 1964, the area would nevertheless become a borough under the mandate of Ch. 52.[11]

■■ Jefferson asserts that the statute under which the Borough assembly was established and which controls the composition and apportionment of the assembly was unconstitutional, thereby vitiating the Borough's legal existence. Assuming that Jefferson is correct in asserting that the proportional representation scheme of former AS 7.10.040 [12] was unconstitutional, we do not agree that this defect would necessarily foreclose creation of the Bor-

9. *Port Valdez* dealt with an annexation of territory to an existing municipality. The court concluded, however, that annexations are so similar to incorporations that the *de facto* doctrine is applicable.

10. "Where the statute under which the municipality professed to incorporate was unconstitutional, some cases have permitted private collateral attack, although there are contra cases. The former cases permitting attack seem to represent the better view since there is no possibility of even a de facto municipal corporation where the authorizing statute is unconstitutional."
1 C. Antieau, Municipal Corporation Law § 1.08, at 28 (1973) (footnotes omitted).

11. Other areas were likewise required to incorporate under Ch. 52 S.L.A.1963.

12. Sec. 07.10.040. *Standards for composition and apportionment.* The borough assembly shall be composed and apportioned according to the following standards.
    (1) If there is no first class city within the organized borough, the assembly is composed of the number of seats shown on the following table:

| Population | Assembly Seats |
| --- | --- |
| under 6,000 | 5 |
| 6,000—12,000 | 7 |
| 12,001—30,000 | 9 |
| over 30,000 | 11 |

(2) If there is but one first class city in the organized borough, the assembly is composed of at least two assemblymen from the first class city and at least three assemblymen from the area outside the first class city.
(3) If there is more than one first class city in the organized borough, the assembly is composed of at least one assemblyman from each first class city and at least three assemblymen from the area outside first class cities.
(4) The assembly seats shall be apportioned as follows:
(a) Except as provided in (2) of this section, each first class city shall have the number of seats designated in the following table, unless a lesser number is approved by a resolution of the city council of the city concerned:

| Population | Assembly Seats |
| --- | --- |
| under 2,000 | 1 |
| 2,000—6,000 | 2 |
| 6,001—12,000 | 3 |
| 12,001—30,000 | 4 |
| over 30,000 | 5 |

(b) The area outside first class cities shall have a number of assemblymen which shall equal one more than the total number of all assemblymen who represent first class cities.

ough assembly. The statute had four sections. The first section dictated only the number of seats on the assembly; the remaining sections stated how those seats were to be apportioned among the voters. If those apportionment standards were unconstitutional,[13] they could have been declared void without affecting the first section, since the first section was clearly separable from the latter sections. The test for separability of a statute (where one part of it is invalid) is whether the remaining parts are so independent and complete that it may be presumed that the legislature would have enacted the valid parts without regard to the invalid part.[14] In this case the test is satisfied; we presume that the legislature undertook to establish the number of assemblymen for each class of borough and would have done so whether or not any particular apportionment formula be provided.

Moreover, even were these provisions—the structure of the assembly and the apportionment of assembly seats—completely inseparable, we do not conclude that the lack of a valid legislative body would prevent the valid incorporation of the municipality. This conclusion is bolstered by noting that Alaska's newly-enacted Municipal Government Code [15] has completely separated the statutes relating to the incorporation procedure [16] from those relating to the borough's legislative body.[17] We agree with the legislature that the incorporation of a municipality is a process both conceptually and functionally distinct from that of establishing a legislative body for that corporation.

We are satisfied that there was a valid statute under which the Borough could and did incorporate. Since Jefferson made no claim concerning the other three elements necessary to establish *de facto* municipal existence, the superior court properly ruled that the Borough was a valid entity as against a collateral attack.[18]

## THE CITY'S CHARTER

Jefferson argues also that the sewer transfer was and is invalid, because the City's home rule charter prohibits the sale or disposition of the City's utility assets unless three-fifths of the City's voters approve the disposition.[19] No election was held.[20]

The Borough contends that the City's charter is over-ridden by state law in this area.[21] In particular, the Borough relies on former [22] AS 7.15.310, which provides in part:

"No city of any class, whether home rule or not, within an organized borough,

13. Judge Stewart ruled that this representational scheme was unconstitutional in City of Juneau v. Borough First Judicial District Cause No. 65–317 (1968), 6 Alaska L.J. 197–9 (1968).

14. *See* 2 J. Sutherland, Statutory Construction § 2404 (3rd ed. F. Horack 1943).

15. Chapter 118, S.L.A.1972 repealed and replaced the statutes under which the Borough was incorporated.

16. Chapter 18, of Title 29, entitled "Incorporation."

17. Chapter 23, Art. 1 of Title 29, entitled "Borough Assembly."

18. Our disposition of this issue makes it unnecessary to rule on the Borough's contention that Jefferson's complaint was never properly amended to include this attack on the Borough's existence.

19. The City of Anchorage has adopted a home rule charter which provides in § 13.4:
"The counsel may sell, lease or otherwise dispose of a municipal utility or of property and interest in property used or useful in the operation of a utility only after a proposition to do so is approved by three-fifths of the electors of the city voting on the proposition."

20. The Borough makes no claim that the areawide sewer election of 1966 satisfied the city charter requirement.

21. The City joins the Borough in making this contention.

22. This controversy must be decided with reference to the former statutes, *see* n. 5, *supra*, governing transfer of powers because Ch. 118, S.L.A.1972 had a savings clause:
"A right or liability of a home rule or general law city or borough existing on September 10, 1972 is not affected by the enactment of this Act."

may exercise any areawide power provided in this section . . . once that power is being exercised by an organized borough." [23]

This court has dealt with conflicts between state law and a municipal home rule charter or ordinance in several cases.[24] The starting point for an analysis of this issue must be found in the Alaska constitution, Art. X, § 11:

"A home rule borough or city may exercise all legislative powers not prohibited by law or charter."

The authors of this provision hoped that its simple language and sweeping grant of power would enable home rule municipalities to meet a multitude of legislative needs without depending on specific grants of power from a state legislature.[25] They were aware of the difficulties encountered in other jurisdictions where delegations of power to local government units were conferred in terms, such as "matters of local concern" or "of local affairs," which were intended to create an exclusive sphere of municipal action free from any intrusion by the state legislature.[26] Attempts by the courts in those jurisdictions to resolve conflicts between local enactments under such limited delegations of authority and state statutes relating generally to the same subject have often led to confusion and inconsistencies.[27] Then too, some commentators have suggested that constitutional or statutory home rule provisions had been rendered ineffective in other states because of restrictive court decisions.[28] With this all before them the constitutional delegates undertook to give Alaska home rule municipalities a wide range of powers to meet the differing needs of the varied and scattered communities of this state. It was hoped that the constitutional delegation of authority to local government units under the terms of Art. X, § 11 would lead the courts of this jurisdiction to take a new and independent approach when con-

23. Among the powers "provided in this section" are those transferred from city to borough pursuant to AS 7.15.350, which provides in part:
"Second class boroughs acquire additional areawide powers in the same manner provided by §§ 710–800 of this chapter . . . except that the vote on the question is areawide."

24. It has been claimed our approach has not always been entirely consistent. *See* Sharp, Home Rule in Alaska: A Clash Between the Constitution and the Court, 3 U.S.L.A.—Alaska L.R. 1 (1973).

25. Art. X, section 1, the introductory section on home rule in the Alaska constitution reads:
"The purpose of this article is to provide for maximum local self-government with a minimum of local government units, and to prevent duplication of tax-levying jurisdiction. A liberal construction shall be given to the powers of local government units."

26. *See* Sharp, *supra*, note 25 at 3. Most courts fail to distinguish between the types of home rule provisions. The provisions of other jurisdictions described in the text are sometimes designated as "shield" or "protection" provisions and usually require a court's determination of whether an exercise of municipal power is statewide or local in nature, when such exercise of power con-

flicts with a state statute. Alaska's home rule provision is a "grant" or "sword" of legislative power given to the municipality to be exercised as long as it is not prohibited by law. Art. X, § 11.
This difference between "shield" and "sword" provisions was implicitly recognized in Rubey v. City of Fairbanks, 456 P.2d 470, 475 (Alaska 1969) where the court declined to follow California's pre-emption-by-state-occupation-of-the-field doctrine because of the difference between California's and Alaska's home rule provisions. California's provision is a combination "shield" and "sword", while Alaska's is solely a "sword". *See* Duvall, Delineation of the Powers of the Alaska Home Rule City: The Need for a Beginning, 8 Alaska L.J. 232, 233–35 (Oct. 1970); Sato & Van Alstyne, State and Local Government Law 216–218 (1970).

27. Alaska Legislative Council and Local Affairs Agency, Final Report on Borough Government, 36 (1961).

28. *See* Fordham & Asher, Home Rule Powers in Theory and Practice, 9 Ohio St.L.J. 18 (1948): Richland, Courts Nullify Home Rule, 44 Nat'l Mun.Rev. 565–70 (1955); Sato, "Municipal Affairs" in California, 60 Cal. L.Rev. 1055 (1972). *But see also* Sandalow, The Limits of Municipal Powers Under Home Rule; A Role for the Courts, 48 Minn.L.R. 643 (1963–64).

flicts inevitably arose between the municipalities and the state.[29] The foundation for this new approach has been laid in the past decisions of this court which have favored the exercise of legislative powers by local government units.[30]

■ However, to say that home rule powers are intended to be broadly applied in Alaska is not to say that they are intended to be pre-eminent. The constitution's authors did not intend to create "city states with mini-legislature." [31] They wrote into Art. X, § 11 the limitation of municipal authority "not prohibited by law or charter." The test we derive from Alaska's constitutional provisions is one of prohibition, rather than traditional tests such as statewide versus local concern.[32] A municipal ordinance is not necessarily invalid in Alaska because it is inconsistent or in conflict with a state statute. The question rests on whether the exercise of

authority has been prohibited to municipalities. The prohibition must be either by express terms or by implication such as where the statute and ordinance are so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law.[33]

■ In this case we find the prohibition to be express. The statutes established a procedure by which certain city powers could be transferred to a second class borough and precluded a city from exercising a power once that power was being exercised areawide.[34]

This then presents a clear case in which statutory authority overrides a provision in a home rule charter. Our conclusion is consistent with the new municipal code, which retains in large measure the relevant statutory provisions we have found controlling in this case.[35]

29. *See* Sharp, Home Rule in Alaska, *supra*, note 25, at 22–27.

30. *See* Lien v. City of Ketchikan, 383 P.2d 721–723 (Alaska 1963) ; City of Juneau v. Hixson, 373 P.2d 743 (Alaska 1962) ; Rubey v. City of Fairbanks, 456 P.2d 470–475 (Alaska 1969).

31. Duvall, Delineation of the Powers of the Alaska Home Rule City: The Need for a Beginning, 8 Alaska L.J. 232, 240 (Oct. 1970).

32. *See* Sharp, *supra* note 25, at 30–31; Duvall, *supra* note 27 at 235, 237–239. In Rubey v. City of Fairbanks, 456 P.2d 470, 475 (Alaska 1969) this court recognized a prohibition test for conflict resolution between state and local legislation :

"Article X, section 11 of the Alaska constitution provides that a home rule city, such as Fairbanks, 'may exercise all legislative powers not prohibited by law or by charter.' There is no legislative enactment in Alaska that expressly prohibits a home rule city from making assignation a criminal offense. We do not find such prohibition from the fact that the Alaska legislature has extensively covered the field of sexual offenses. We believe there would have to be some additional factor from which the intent of the legislature to prohibit local regulation in this area could be reasonably inferred. We are not aware of any such factor in this case."

33. We reaffirm our rejection of the doctrine of state pre-emption by "occupying the field." We will not read into a scheme of statutory provisions any intention to prohibit the exercise of home rule authority in that area of the law. If the legislature wishes to "pre-empt" an entire field, they must so state. *See* Rubey v. City of Fairbanks, 456 P.2d 470 (Alaska 1969).

We note that the legislature has done this in its new Title 29, Municipal Code. AS 29.-13.100 provides in part :

"Only the following provisions of this title apply to home rule municipalities as prohibitions on acting otherwise than as provided."

34. Formerly AS 7.15.350; AS 7.15.310. The statutes further provided that such boroughs (of which the Anchorage borough is one) shall acquire city powers in the manner provided in AS 7.15.710–7.15.800, except that the vote on the question is areawide.

AS 7.15.710–7.15.800 provided for the filing of a petition by the borough with the Local Affairs Agency (now the Dept. of Community and Regional Affairs), review of the approved (as to form) petition by the Local Boundary Commission, a hearing on the petition held by the Local Boundary Commission, and finally an election on the proposal.

35. AS 29.33.010(b) (exercise of areawide borough powers) ; AS 29.33.290(c) (acquisi-

Our decision in the case at bar is in accord with this court's opinions relating to cases of conflict between local ordinances and state enactments. In Lien v. City of Ketchikan,[36] we held that the home rule provisions of the state constitution validated a lease of a hospital to a charitable non-profit corporation despite non-compliance with a state statute governing leases by municipalities. The statute was held inapplicable and not a limitation upon the city's home rule authority, the source of which is found in Article X, section 7 of Alaska's constitution.

In Chugach Electric Association v. The City of Anchorage[37] the issue was whether the City of Anchorage could block the electric association from providing electrical service to a customer within the association's service area. The Alaska Public Service Commission had previously granted the association a certificate of convenience and necessity to provide electrical service within certain areas of the city. The City refused to issue to the Association a building permit on the grounds that the City's own electrical utility could better serve the customer. We resolved the conflict by application of a rule requiring the local enactment to yield where it directly or indirectly impeded implementation of statutes which sought to further a specific statewide policy. This court discerned in the statute a strong policy in favor of treating regulation of public utility service areas as a matter of statewide concern. The situation was one in which locally created variations from state regulation could have affected public utilities beyond the local area. In these circumstances we found a legislative intent that regulated utilities were to be within the exclusive jurisdiction of the Public Service Commission to the extent that such jurisdiction was conferred

upon the Commission. Accordingly, municipalities were prohibited from regulating the same utilities to the extent of the Commission's proper jurisdiction.

In Macauley v. Hildebrand[38] a state statute permitted borough assemblies to centralize by ordinance their school district accounting systems with other borough operations with school board consent. An ordinance of the City and Borough of Juneau required the Juneau School District to centralize the district's accounting system without the school board's consent. Although the statutory prohibition in *Macauley* was direct, this court offered another reason for striking down the questioned ordinance. The statute involved in *Macauley* was an express delegation by the state legislature to municipal corporations of a constitutionally mandated legislative power.[39] We reasoned that the language of the state constitution mandating maintenance of a school system by the state vested the legislature with pervasive control over public education. Thus, home rule municipalities were precluded from exercising power over education unless, and to the extent, delegated by the state legislature; and the local ordinance was therefore overriden by the statute.

Affirmed.

CONNOR, J., concurs separately.

CONNOR, Justice (concurring separately).

I agree with the majority opinion, but wish to add some observations about judicial method in resolving conflicts between state statutes and municipal ordinances. More particularly I wish to discuss the "local activities rule", and the place it has in the process of determining the validity of ordinances of a home rule municipality.

tion of additional areawide powers). These are enumerated as specific prohibitions to municipalities in AS 29.13.100. *See* note 34 *supra*.

36. 383 P.2d 721 (Alaska 1963).

37. 476 P.2d 115 (Alaska 1970).

38. 491 P.2d 120 (Alaska 1971).

39. Alaska Const., Art. VII, § 1:
The legislature shall by general law establish and maintain a system of public schools open to all children of the State.

There is no question that we must adhere to the policy expressed in the constitution which requires that we give a broad reading to the powers of home rule cities and boroughs. That in itself poses no difficulty. This general policy, however, will not solve the real problem, which lies in the inherent potentiality of conflict between statutory law enacted by the legislature and local ordinances.

One possible solution is to hold that only where the legislature has expressly declared its intention to prohibit the exercise of municipal powers should we declare municipal ordinances void. Such an approach would have the advantage of simplicity. Unfortunately, such a mechanical jurisprudential technique is so simple that it would not serve the needs of the public. In extreme cases it probably would not survive constitutional attack.[1]

The state legislature has expressly prohibited the exercise of total local power in such areas as taxation, AS 29.73.040, AS 29.53.350, AS 29.53.400; utilities regulation, AS 29.48.040–29.48.100; security for bonds, AS 29.58.180(b); municipal elections, AS 29.28.010, AS 29.28.020(b)–29.-28.030; and other matters of general state concern. *See,* AS 29.13.100. It is naive, however, to expect that these prohibitions contemplate each and every matter in which the legislature would properly wish to restrict local power. A home rule concept which relies only on express prohibition to define the scope of local power presupposes a degree of legislative foresight and draftsmanship ability which is completely unrealistic. *See* Duvall, Delineation of the Powers of the Alaska Home Rule City: The Need for a Beginning, 8 Alaska Law Journal 232, 239 (1970).

For example, the Uniform Commercial Code, AS 45.05.002 et seq., and the Insurance Code, AS 21.03.010 et seq., enacted by the legislature, no doubt were meant to operate upon a statewide basis, though nothing in those codes expressly prohibits municipal legislation in the field of commercial law or insurance law. Yet to say that a home rule city could alter the operation of such comprehensive statutory systems would be intolerable. Transactions whose reliability is vital to a functioning economy would become unsettled, to the detriment of the business community and the citizenry of the state. A conflict between the city and the state could not be ignored in this type of situation, despite the absence of an express prohibition.

In such instances the courts must resolve the conflict. There is no escape from our duty to adjudicate legal claims which arise from two constitutional provisions of equal dignity, *i. e.,* the grants of power to both the legislature and to home rule cities.

The question, then, is not the propriety of judicial action or abstention. Rather, the problem is what methods should be employed by courts when presented with those conflicts between municipal ordinances and state statutes which will inevitably occur. As with many questions of public law, the answer is to be found through an analysis and weighing of the various social and governmental interests which bear upon such a conflict.

One test we have used in determining whether the ordinance or the statute must yield, is the "local activities rule." This test, as applied in Chugach Electric Association v. City of Anchorage, 476 P.2d 115 (Alaska 1970), and Macauley v. Hildebrand, 491 P.2d 120 (Alaska 1971), should not be regarded, as it has been by one commentator,[2] as the rule the framers of the constitution rejected in establishing a broad home rule policy. Rather, it should

---

1. Examples are Turner v. Staggs, 510 P.2d 879 (Nev.1973), and Reich v. State Highway Department, 386 Mich. 617, 194 N.W.2d 700 (1972). These cases concern municipal ordinances barring suit by tort claimants unless notice is given within a certain period of time following the injury. Because the time periods provided by ordinance were shorter than the statutory period of limitation applicable to claimants against private persons, the ordinances were in these cases held unconstitutional as denying to tort claimants the equal protection of the laws.

2. *See,* Sharp, Home Rule in Alaska: A Clash Between the Constitution and the Court, 3 UCLA Alaska Law Review 1, 53 (1973).

be recognized as a realistic tool by which to interpret this policy. The "local activities rule" requires the court to focus upon whether the particular subject under consideration is of such statewide concern that the exercise of municipal power is inconsistent with the effectuation of statewide policy, as expressed by statute. Some matters are obviously of statewide concern, some less so. Some matters are so traditionally and readily classified as matters of local government that there will be no difficulty in finding that they are within municipal competence. Here, too, the municipal code adopted by the legislature is of great help in delineating the areas of permissible local action.

Inevitably, there will be cases which fall within a gray area. As to those the courts must attempt to balance competing interests, bearing in mind the constitutionally stated policy of permitting maximum home rule and yet preventing the chaotic state of affairs which would result if each home rule municipality were allowed to legislate as though it were a feudal city-state. When dealing with cases in the gray area, the courts must strike a balance as best they can, after careful consideration of the competing interests and public policies which bear upon the outcome. Thus in Chugach Electric Association, *supra,* 476

P.2d at 123, we spoke of balancing "the needs of the entire state against the desirable autonomy which only home rule can provide." The ultimate question, of course, is whether, from an examination of the statutes, a prohibition against home rule powers can be discerned, either expressly or by implication. Fortunately, if the judicial decision in such cases is unacceptable, relief may still be sought from the legislature, which can, if it chooses, alter the determination. A judicial decision of such a question is not, therefore, the end of the controversy.

Those who advocate that the conflict between statutes and ordinances should be resolved by simply holding in favor of home rule in all instances where the legislature has not stated an express prohibition are seeking an illusionary, unworkable solution to a problem which is quite complex and which is, like many things in modern life, not susceptible to decision by mere slogans or mechanical formulae. "The price of certainty is too high when it involves a failure to face the real policy questions involved." [3]

I favor the "local activities rule" applied in *Macauley* and *Chugach,* for the rule is, in my opinion, a useful one in resolving the conflict between statute and ordinance.

3. Calif. Governor's Comm'n on the Law of Preemption, Report and Recommendations, 6 (1967), cited in Duvall, *supra,* at 244.