*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| GEORGE G. JACKO and JACKIE G. HOBSON SR., | ) ) ) Supreme Court No. S-15516 |
| Appellants, | ) ) Superior Court Nos. 3DI-11-00053 CI ) and 3AN-11-11833 CI (Consolidated) |
| v. | ) ) O P I N I O N |
| STATE OF ALASKA, PEBBLE LTD. PARTNERSHIP, acting through its General Partner, PEBBLE MINES CORP., LAKE & PENINSULA BOROUGH, and KATE CONLEY, in her official capacity as Clerk of the Lake & Peninsula Borough, | ) ) ) No. 7019 – July 17, 2015 ) ) ) ) ) ) ) |
| Appellees. | ) ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Dillingham, John Suddock, Judge.

Appearances: Timothy A. McKeever and Scott Kendall, Holmes Weddle & Barcott, P.C., Anchorage, for Appellants. Joanne M. Grace and Margaret Paton Walsh, Assistant Attorneys General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska. Matthew Singer, Holland & Knight LLP, Anchorage, for Appellee Pebble Limited Partnership. No appearance for Appellees Lake & Peninsula Borough and Kate Conley. Victoria Clark, Trustees for Alaska, Anchorage, for Amicus Curiae Nunamta Aulukestai. Daniel L. Cheyette, Bristol Bay Native Corporation and Peter Van Tuyn, Bessenyey & Van

Tuyn, LLC, Anchorage, for Amicus Curiae Bristol Bay Native Corporation.

Before: Winfree, Stowers, and Bolger, Justices. [Fabe, Chief Justice, and Maassen, Justice, not participating.]

BOLGER, Justice.

## I.     INTRODUCTION

Lake and Peninsula Borough voters passed an initiative prohibiting large-scale mining activities that have a "significant adverse impact" on anadromous waters within the Borough. Pebble Limited Partnership and the State of Alaska pursued separate suits against the Borough, later consolidated, claiming that the initiative was preempted by state law. Two of the initiative sponsors intervened to support the initiative. The superior court granted summary judgment in favor of Pebble and the State and enjoined the Borough from enforcing the initiative. The initiative sponsors appeal, arguing that the dispute is unripe and that the superior court's preemption analysis was erroneous. But because at least the State has articulated a concrete harm stemming from the initiative's mere enactment, the case is ripe for adjudication. And because the initiative purports to give the Borough veto power over mining projects on state lands within its borders, it seriously impedes the implementation of the Alaska Land Act, which grants the Department of Natural Resources "charge of all matters affecting exploration, development, and mining" of state resources. We therefore affirm.

## II.     FACTS AND PROCEEDINGS

The Lake and Peninsula Borough (the Borough) is a home rule borough in southwest Alaska bordering the world's largest wild sockeye salmon fishery. Within the Borough, on state-owned land, lies what may be the world's largest discovery of

undeveloped copper ore. Pebble Limited Partnership (Pebble) holds the mineral rights to this copper and has spent over a decade exploring the feasibility of mining. However, because extracting the copper would likely generate significant amounts of waste, there is concern that the Pebble project may have detrimental environmental effects that could impair the long-term sustainability of the Borough's salmon industry.[1]

In March 2011 George Jacko, Jackie Hobson, Sr., and other Borough residents proposed the "Save Our Salmon" Initiative #2 (the SOS Initiative), a borough initiative prohibiting the Borough Planning Commission from issuing a permit whenever a proposed resource extraction activity (a) "could result in excavation, placement of fill, grading, removal and disturbance of the topsoil of more than 640 acres of land," and (b) "will have a Significant Adverse Impact on existing anadromous waters." The SOS Initiative defined "Significant Adverse Impact" as

> a use, or an activity associated with the use, which proximately contributes to a material change or alteration in the natural or social characteristics of a part of the state's coastal area and in which:
>
> > a) the use, or activity associated with it, would have a net adverse effect on the quality of the resources of the coastal area;

---

[1]    *See, e.g.*, *Nunamta Aulukestai v. State, Dep't of Natural Res.*, ___ P.3d ___, Op. No. 7011 at 2, 26-48, 2015 WL 3452438, at *1, *12-22 (Alaska May 29, 2015) (holding that certain mineral exploration permits for Pebble project were disposals of State land requiring prior public notice); *Hughes v. Treadwell*, 341 P.3d 1121, 1123, 1125 (Alaska 2015) (confirming previous order for election ballot placement of "Bristol Bay Forever" initiative requiring final legislative authorization for any new large-scale metallic sulfide mining operations in Bristol Bay Fisheries Reserve watershed); *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1078-81 (Alaska 2009) (rejecting Pebble's argument that proposed clean water initiative would be unlawful special legislation despite current application only to Pebble project and one other mine).

b) the use, or activity associated with it, would limit the range of alternative uses of the resources of the coastal area; or

c) the use would, of itself, constitute a tolerable change or alteration of the resources within the coastal area but which, cumulatively, would have an adverse effect.

The SOS Initiative also replaced the requirement that an applicant obtain "[a]ll applicable state and federal permits . . . before a development permit will be issued by the Borough" with the recommendation that an "applicant should obtain its development permit from the Borough prior to obtaining applicable state and federal permits." Additionally, the SOS Initiative authorized the Borough Planning Commission to indefinitely consider applications for large-scale resource extraction permits.

Before the 2011 election, Pebble sued the Borough for declaratory and injunctive relief, contending that the SOS Initiative exceeded the Borough's "power to legislate on matters governing land use permit requirements" and was thus "unenforceable as a matter of law." Pebble asked the superior court to order the Borough not to certify the SOS Initiative and to remove it from the ballot. George Jacko and Jackie Hobson, Sr. (the sponsors) moved to intervene, and the superior court granted their motion. Pebble, the Borough, and the sponsors moved for summary judgment, but the court abstained from ruling on the certification issue and deferred its evaluation of the SOS Initiative's validity until after the election.[2]

In October 2011 Borough voters approved the SOS Initiative, enacting it as Borough law. Pebble then amended its complaint, alleging that the enacted initiative was constitutionally preempted by article VIII of the Alaska Constitution and statutorily

---

[2] Pebble petitioned this court to review the superior court's deferral decision. We declined to review the case at that time.

preempted by the Alaska Land Act.[3] Pebble further claimed that the SOS Initiative improperly appropriated state assets, violated equal protection, and was void for vagueness. Finally, Pebble alleged that the initiative violated the Borough's charter, claiming that the Borough could not amend its municipal code in the absence of a valid comprehensive plan.[4]

The State separately sued the Borough for declaratory and injunctive relief. Like Pebble, the State alleged that the SOS Initiative was preempted by the Alaska Constitution and by the Alaska Land Act. The State further claimed that it had "immunity from the operation of the law enacted by the SOS initiative to the extent that it purports to prohibit development of State land and State-owned minerals." The superior court consolidated the State's case with Pebble's previously filed case.

Each of the parties — Pebble, the State, the sponsors, and the Borough — moved for summary judgment on the merits of Pebble's and the State's claims. The sponsors and the Borough also argued that the case was not ripe because Pebble had not yet applied for a Borough permit.

The superior court granted summary judgment in favor of Pebble and the State. Turning first to ripeness, the court found that there was an "actual controversy" because the likelihood of permit denial would have a "dissuasive effect on potential investors" and place a "real burden" on Pebble. Likewise, the court found that the ability of "local government entities . . . [to] impede natural resource development via permitting ordinances" would have a "profound[] [e]ffect[]" on "the regulatory climate in Alaska" and harm the State's royalty and tax revenues, regardless of whether local entities ultimately chose to grant or deny local development permits.

---

[3]     AS 38.05.005-.990.

[4]     *See* Lake & Peninsula Borough Charter art. VII, §§ 7.01-.02.

On the merits, the superior court concluded that the SOS Initiative was impliedly preempted by state statute. The court noted that the state legislature "comprehensively conferred authority over all aspects of mining in Alaska to [the Department of Natural Resources]" (DNR). And the court found that the SOS Initiative purported to grant the Borough Planning Commission "co-equal permitting authority" with DNR — authority that was "substantially irreconcilable" with the legislature's intent that DNR be the sole gatekeeper of mining permits. Accordingly, the court concluded that the SOS Initiative was impliedly preempted by state statute and enjoined the Borough from enforcing it.

The sponsors appeal.[5]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where, "view[ing] the facts in the light most favorable to the non-moving party," "the record presents no genuine issue of material fact and . . . the movant is entitled to judgment as a matter of law."[6] The moving party has the initial burden of proving, through admissible evidence, that summary

---

[5]    The Borough declined to appeal.

[6]    *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1030 (Alaska 2011) (citations and internal quotation marks omitted).

judgment is warranted.[7]  We review a grant of summary judgment de novo.[8]  We also review the superior court's ripeness and preemption determinations de novo.[9]

## IV.  DISCUSSION

### A.  This Dispute Is Ripe Because The State Articulates A Concrete Harm Stemming From The SOS Initiative's Mere Enactment And Because The Controversy Is Primarily Legal, Not Factual, In Nature.

Alaska Statute 22.10.020(g) grants the superior court jurisdiction to issue a declaratory judgment "[i]n case of an actual controversy."  This "actual controversy" language "reflects a general limitation on the power of courts to entertain cases . . . [and] encompasses a number of more specific reasons for not deciding cases, including lack of standing, mootness, and lack of ripeness."[10]  The sponsors contend that this case is not ripe because "Pebble and the State brought [their claims to the superior court] prior to any application for a permit even having been filed with [the Borough]."

A ripe suit for declaratory judgment will present "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality."[11]

---

[7]  *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 n.25 (Alaska 2008); Alaska R. Civ. P. 56(c) ("There must . . . be served and filed with each motion [for summary judgment] a memorandum showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").

[8]  *Olson*, 251 P.3d at 1030 (quoting *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008)) (internal quotation marks omitted).

[9]  *State v. ACLU of Alaska*, 204 P.3d 364, 367 (Alaska 2009) (ripeness); *cf. Catalina Yachts v. Pierce*, 105 P.3d 125, 128 (Alaska 2005) (preemption).

[10]  *Brause v. State, Dep't of Health & Soc. Servs.*, 21 P.3d 357, 358 (Alaska 2001) (citing *Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1096 (Alaska 1988)).

[11]  *Id.* at 359 (quoting 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE
(continued...)

We have noted that there is "no set formula" for determining whether a case is ripe for adjudication.[12] Instead, "[w]e examine the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration" in an effort to "balance[] the need for decision against the risks of decision."[13]

For example, in *State v. ACLU of Alaska* a group of citizens claimed that the state statute prohibiting marijuana possession "conflict[ed] with the privacy clause of the Alaska Constitution . . . to the extent that it criminalize[d] possession of small amounts of marijuana in the home by adults for personal use."[14] We held this claim unripe.[15] The citizens' need for a decision was "slight" because the penalties for marijuana possession in the federal Controlled Substances Act[16] exceeded state sanctions and would not be affected by the case, and because the citizens did not suggest that they themselves were likely to be the subjects of enforcement or that they would alter their conduct as a result of our decision.[17] Moreover, significant decisional risks were present: concrete facts would have aided us in adjudicating the issue, and "[d]ue respect for the

---

[11]    (...continued)
AND PROCEDURE § 3532, at 112 (2d ed. 1984)) (internal quotation marks omitted).

[12]    *Id.*

[13]    *ACLU of Alaska*, 204 P.3d at 369 (quoting *Brause*, 21 P.3d at 359) (internal quotation marks omitted).

[14]    *Id.* at 366 (citations omitted).

[15]    *Id.* at 373-74.

[16]    Pub. L. No. 91-513, 84 Stat. 1236 (1970).

[17]    *ACLU of Alaska*, 204 P.3d at 369-71, 374.

legislative branch of government requires that we exercise our duty to declare a statute unconstitutional only when squarely faced with the need to do so."[18]

Similarly, in *Brause v. State, Department of Health & Social Services* we held unripe a same-sex couple's claim that Alaska's then-existing prohibition on same-sex marriage prevented them from enjoying at least 115 separate rights afforded to married couples.[19] We noted that the couple's brief lacked "any assertion that they ha[d] been or . . . [would likely] be denied rights that [were] available to married partners."[20] And we observed that further factual development would aid our ability to decide the issue in light of the "difficulty and sensitivity of the issues presented."[21]

Although the sponsors accuse the superior court of basing its ripeness analysis on the *dissenting* opinions in *ACLU of Alaska*[22] and *Brause*,[23] we conclude that the superior court correctly applied the balancing test set forth in those cases. Citing *Brause*, the superior court noted that as a general matter, "[t]he risks of decision include ruling on undeveloped facts[] or on difficult and sensitive issues that could be advantageously deferred." And the court concluded that Pebble's and the State's "need for decision" outweighed any countervailing risks of decision. In particular, the court found that the mere passage of the SOS Initiative "exert[ed] a dissuasive effect on [Pebble's] potential investors." Likewise, the court found that the ability of "local

---

[18]    *Id.* at 371-74.

[19]    21 P.3d 357, 360 (Alaska 2001).

[20]    *Id.*

[21]    *Id.* (quoting 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3532.1, at 114-15 (2d ed.1984)).

[22]    204 P.3d at 374-82 (Carpeneti, J., dissenting).

[23]    21 P.3d at 360-66 (Bryner, J., dissenting).

government entities statewide [to] impede natural resource development via permitting ordinances" would have a "profound[] [e]ffect" on "the regulatory climate in Alaska . . . from the moment such risks are manifest in local laws, and not only at the moment of permit denial." As a result, the court concluded that the "case [fell] squarely within the broad swath of Alaska cases found . . . to be ripe for adjudication."

We do not need to evaluate Pebble's claims of harm, because the State's claimed harm is sufficiently immediate and real to require a facial review of the SOS Initiative's validity. In its superior court briefing, the State noted that it did "not sue[] as a potential permittee." Instead, the State contended that the Initiative's mere enactment "inappropriately infringe[d] on its sovereign power" and therefore "impose[d] a concrete harm even without application."

In an effort to rebut the State's claimed harm, the sponsors pointed out that the State had not sued other boroughs regarding their land use regulations. But the superior court found this lack of previous litigation unpersuasive, and we are similarly unpersuaded. The State's decision not to sue other boroughs for different ordinances does not mean it *cannot* sue them. As the superior court noted, "the [S]tate has scant incentive to challenge" other boroughs' ordinances "insofar as [they] fill[] in unregulated interstices of state law" and only "theoretically conflict with DNR authority." The SOS Initiative is different, the court concluded, because it grants the Borough regulatory power that was "co-equal" and "concurrent" with the State's authority over natural resource policy .

On appeal the sponsors' ripeness arguments largely pertain to Pebble's claims and do not directly address the State's sovereignty argument. Critically, the sponsors' ripeness discussion does not address the superior court's finding that the enactment of the SOS Initiative hinders the State's ability to regulate natural resource

policy. This finding provides adequate and independent support for the court's conclusion that this controversy is ripe.

The sponsors also point to our suggestion in *ACLU of Alaska* that even a facial challenge to a statute "could be aided by one or more concrete factual scenarios."[24] But it is unclear that additional factual scenarios *would* aid our adjudication of the merits in this case because the underlying issues are relatively straightforward and purely legal: does the SOS Initiative grant the Borough the power to exercise coequal permitting authority with the State regarding the utilization of natural resources, and, if so, is such authority preempted by state statute or by the Alaska Constitution? The Borough's grant or denial of a development permit would shed little if any light on these questions.

Finally, the sponsors accuse the superior court of "rest[ing] its ripeness determination entirely on . . . facts . . . obtained in an ex parte investigation."[25] This allegation pertains to the court's observation that

> [i]n September of 2013 the British mining giant Anglo American withdrew from [Pebble], abandoning its $541 million investment and citing a need to focus on more promising prospects. Anglo American's departure left Northern Dynasty Minerals the sole stakeholder in the project. Northern Dynasty announced that it would seek a replacement partner.

The sponsors point out that the news of Anglo American's withdrawal from the Pebble project became public "five days *after* oral argument" and was therefore "never made a part of the record." (Emphasis in original.) As a result, the sponsors argue, "[t]he

---

[24]     204 P.3d at 373 (citing *Sands ex rel. Sands v. Green*, 156 P.3d 1130, 1132-34 (Alaska 2007)).

[25]     *See* Alaska Code Jud. Conduct 3(B)(12) ("Without prior notice to the parties and an opportunity to respond, a judge shall not engage in independent ex parte investigation of the facts of a case.").

parties . . . were precluded from any opportunity to present argument on these points." But though there is some validity to this criticism with regard to Pebble's claims of harm,[26] it has no relevance to the State's claimed harm to its regulatory authority.

For these reasons, we agree with the superior court's conclusion that this controversy was ripe for adjudication.

**B.      The SOS Initiative Is Impliedly Preempted By State Law Because The Borough's Ability To Unilaterally Veto A Project Authorized By DNR Seriously Impedes The Regulatory Structure Of The Alaska Land Act.**

Article X, section 11 of the Alaska Constitution grants home rule boroughs "all legislative powers not prohibited by law or by charter." In *Jefferson v. State* we noted that although "home rule powers are intended to be broadly applied," a municipal ordinance may be preempted or invalidated by state statute.[27] But we held that the statutory "prohibition must be either by express terms or by implication such as where the statute and ordinance are so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law."[28]

Though *Jefferson* involved express preemption,[29] we applied its holding to an implied conflict of law four years later in *Johnson v. City of Fairbanks*.[30] The plaintiff in *Johnson* challenged a Fairbanks City Charter provision that shielded the city from liability for negligence unless a plaintiff submitted written notice to the city within 120

---

[26]      *See* ALASKA COMM'N ON JUDICIAL CONDUCT, ADVISORY OPINION 2014-01 (discussing whether independent Internet research "can be considered 'judicial notice' and when [such] research become[s] improper factual investigation").

[27]      527 P.2d 37, 43 (Alaska 1974).

[28]      *Id.*

[29]      *Id.*

[30]      583 P.2d 181, 185-87 (Alaska 1978).

days of the incident.[31] Because the statute of limitations for a tort action is two years,[32] we concluded that Fairbanks's notice requirement was impliedly preempted by AS 09.65.070, which authorizes lawsuits against local governments.[33] Although there was no express preemption — notice and filing are technically two separate issues, and the 120-day notice provision did not require plaintiffs to file their complaints within that period — we concluded that the city's notice requirement "seriously impede[d] implementation of th[e] statewide legislative policy" that "a plaintiff's commencement of action is the affirmative step necessary to assure that his assertion of a claim is timely."[34]

Under the implied preemption standard articulated in *Jefferson* and *Johnson*, we must determine whether the SOS Initiative is so substantially irreconcilable with a state statute that the "one cannot be given its substantive effect if the other is to be accorded the weight of law."[35]

Article VIII, section 2 of the Alaska Constitution states that "[t]he legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people." And the legislature, through its passage of the Alaska Land Act, has delegated to DNR "charge of all matters affecting exploration, development, and mining

---

[31]     *Id.* at 182-83.

[32]     AS 09.10.070(a).

[33]     *Johnson*, 583 P.2d at 187.

[34]     *Id.*

[35]     *Id.* at 184 (quoting *Jefferson v. State*, 527 P.2d 37, 43 (Alaska 1974)).

of the mineral resources of the state, . . . and the administration of the laws with respect to all kinds of mining."[36]  The legislature has further clarified that

> [DNR] is the lead agency for all matters relating to the exploration, development, and management of mining, and . . . shall coordinate all regulatory matters concerning mineral resource exploration, development, mining, and associated activities.  Before a state agency takes action that may directly or indirectly affect the exploration, development, or management of mineral resources, the agency shall consult with and draw upon the mining expertise of [DNR].[37]

But while DNR has broad power to regulate mining throughout the state, an "act of the state legislature" is necessary before DNR may close any area of state land larger than 640 contiguous acres to mining.[38]

Here the superior court concluded that the state legislature, "[b]y so definitively conferring gatekeeper permitting authority upon DNR, . . . impliedly prohibited local governments from assuming a concurrent role."  The court also concluded that "to the extent . . . the SOS Initiative may be seen as potentially closing the entire [Borough] watershed to large scale mineral development, it would violate the clear purpose of AS 38.05.300" — the provision requiring DNR to obtain legislative approval before completely closing off large tracts of land to resource extraction.

The sponsors argue that these conclusions were erroneous.  They contend that "there is no expressed or implied preemption of [the Borough's] authority to regulate large-scale resource extraction in the manner the SOS Initiative mandates," because "the

---

[36]  AS 27.05.010(a).

[37]  AS 27.05.010(b).

[38]  *See* AS 38.05.300(a).

SOS Initiative does not confer [the Borough] with 'co-equal permitting authority' with the state or federal government."[39] We disagree.

According to its statement of purpose, the SOS Initiative was designed "to prevent the development of any large-scale resource extraction activity (including mining activities) which would destroy or degrade salmon habitat." To accomplish this objective, the SOS Initiative requires the Borough to deny a development permit to any large-scale resource extraction activity that would have a significant adverse impact on existing anadromous waters — without regard to whether such impact can be mitigated. This stands in stark contrast to other resource development permitting processes, which compare the adverse impacts of a project with potential mitigation measures.[40] As a result, the Borough's permitting standard is now more stringent than the State's.

The sponsors contest this point, claiming that the SOS Initiative "merely inserts an additional local layer into the permitting process" in "an effort to minimize the

---

[39] The sponsors make two additional arguments: first, that the SOS Initiative does not close the entire Borough watershed to large-scale mineral development, and second, that the superior court's decision was inappropriately paternalistic and offensive toward Borough officials. But the superior court did *not* find that the SOS Initiative closed the entire Borough watershed to large-scale resource extraction, and our analysis does not depend upon such a finding. And the superior court's statements about political forces influencing Borough officials are beside the point: the superior court's ruling was based on a conclusion that Borough officials *could* exercise veto power over the Pebble project, not a finding that they necessarily *would*.

[40] One of Pebble's experts stated in an affidavit, "Typically, an environmental impact assessment involves developing a clear understanding of baseline conditions and a clear understanding of how those conditions will be changed or affected by a project. From this follows an evaluation of whether those changes are acceptable or can be mitigated. It does not appear that the SOS Initiative allows room for such [mitigation] analysis." Although the sponsors argued that "[p]resumably, appropriate mitigation measures could qualify an otherwise ineligible project," they did not present any evidence to support this assertion.

adverse environmental effects of large-scale mining on the [B]orough and its residents."

But as noted above, the SOS Initiative sets a high standard for Borough development permits and would allow the Borough to veto projects otherwise authorized by state and federal regulators. Indeed, the SOS Initiative goes so far as to suggest that an "applicant should obtain its development permit from the Borough *prior* to obtaining applicable state and federal permits."[41] (Emphasis added.) Although the sponsors correctly note that the "prior to" language is not mandatory,[42] this language demonstrates that the SOS Initiative was intended to elevate the importance of the Borough in the overall permitting scheme.

For these reasons, the superior court was correct to conclude that the SOS Initiative, if upheld, would represent a "power shift" requiring DNR — the state agency tasked by the legislature to regulate resource extraction — "to share power with a local government that . . . may ignore DNR's rulings. Under such a scheme, DNR [would] no longer function[] as the sole gatekeeper" in granting and denying mining permits. Such a power shift is impliedly preempted by AS 27.05.010's provision that DNR "has charge of all matters affecting exploration, development, and mining of the mineral resources of the state."[43]

---

[41]     This Borough-first language replaces language which suggested that the Borough would defer to state and federal permit processes. The repealed language stated: "All activities shall be conducted in conformance with all state and/or federal permit stipulations and conditions. *All applicable state and federal permits must be obtained by the applicant before a development permit will be issued by the Borough.*" Former Lake & Peninsula Borough Municipal Code 09.07.050(B) (2010) (emphasis added).

[42]     The amended provision uses the word "should" instead of "must."

[43]     Although the superior court concluded that the SOS Initiative is impliedly
(continued...)

The sponsors argue that this preemption analysis is incorrect. Citing *Pebble Ltd. Partnership ex rel. Pebble Mines Corp. v. Parnell*[44] and *Brooks v. Wright*,[45] they contend that "[i]t has been unequivocally established by this Court that the state legislature does *not* have exclusive authority over the state's natural resources," and that "natural resource management is an appropriate subject for a public initiative." (Emphasis in original.) But these cases, which dealt with *statewide* ballot initiatives,[46] are easily distinguished. Article XII, section 11 of the Alaska Constitution provides that "[u]nless clearly inapplicable, the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of Article XI." And because "natural resource management is not . . . 'clearly inapplicable' to the initiative process," we have upheld the ability of voters to pass *statewide initiatives* to exercise the law-making powers of the *state legislature* in this area.[47] But we have never held that a borough may exercise the law-making powers of the state legislature through initiative, nor would such a holding make any sense.

Relatedly, the sponsors claim that we have "repeatedly found that the State does not have exclusive law-making powers over natural resources merely because of its management role under Article VIII" and that we have "accepted municipal regulation

---

[43]     (...continued)
preempted by state law, the initiative also appears to be *expressly* preempted by AS 38.05.135(a), which states: "Except as otherwise provided, valuable mineral deposits in land belonging to the state shall be open to exploration, development, and the extraction of minerals."

[44]     *See* 215 P.3d 1064, 1077 (Alaska 2009).

[45]     *See* 971 P.2d 1025, 1033 (Alaska 1999).

[46]     *See Pebble Ltd. P'ship*, 215 P.3d at 1068-69; *Brooks*, 971 P.2d at 1026.

[47]     *Brooks*, 971 P.2d at 1030, 1033.

-17-                                                          **7019**

of mining as appropriate." (Emphasis omitted.) They cite *Owsichek v. State, Guide Licensing & Control Board*,[48] *Liberati v. Bristol Bay Borough*,[49] and *Thane Neighborhood Ass'n v. City & Borough of Juneau*[50] for these propositions. But *Owsichek* concerned a separate constitutional provision — the Common Use Clause[51] — and did not address preemption.[52] *Liberati* is similarly inapposite because we concluded that the ordinance at issue there had "no regulatory component" and therefore did not directly or indirectly conflict with the State's regulatory policies.[53] And neither party in *Thane Neighborhood Ass'n* raised the issue of state statutory preemption;[54] therefore we did not "accept municipal regulation of mining as appropriate" when such regulation seriously impedes state policy.

The sponsors next argue that the superior court misconstrued our holding in *Johnson*, which they contend was "premised upon the fact that 'the local enactment [must] yield if it directly or indirectly impede[s] implementation of statutes which [seek] to further a *specific statewide policy*.' "[55] (Emphasis and first alteration in original.) The sponsors state that "there is no specific statewide policy that precludes [the Borough] from implementing and carrying out the SOS Initiative as an ordinance under the

---

[48]    763 P.2d 488 (Alaska 1988).

[49]    584 P.2d 1115 (Alaska 1978).

[50]    922 P.2d 901 (Alaska 1996).

[51]    Alaska Const. art. VIII, § 3.

[52]    *See* 763 P.2d at 496-98.

[53]    584 P.2d at 1121-22.

[54]    *See generally* 922 P.2d 901.

[55]    *See Johnson v. City of Fairbanks*, 583 P.2d 181, 185 (Alaska 1978).

[Borough] Code." We disagree. The superior court not only accurately described *Johnson*'s holding but also quoted *Johnson*'s discussion of the specific state policy at issue in that case. More importantly, the SOS Initiative impedes at least *two* separate, specific state policies. The state legislature has specified that "[e]xcept as otherwise provided, valuable mineral deposits in land belonging to the state shall be open to exploration, development, and the extraction of minerals."[56] And the legislature has specified that DNR "has charge of all matters affecting exploration, development, and mining of the mineral resources of the state . . . and the administration of the laws with respect to all kinds of mining."[57]

Finally, the sponsors argue that the SOS Initiative does not confer the Borough with "co-equal permitting authority" because the Borough has regulated resource extraction for decades, and because other boroughs, including the City and Borough of Juneau, the Fairbanks North Star Borough, and the North Slope Borough, have enacted land use regulations that affect resource extraction. The sponsors contend that the SOS Initiative — like these other ordinances — falls under the authority granted by AS 29.35.180(b), which requires "home rule borough[s] [to] provide for planning, platting, and land use regulation." But the general provision of authority to home rule boroughs to regulate land use does not override the specific delegation of authority to

---

[56] AS 38.05.135(a).

[57] AS 27.05.010(a). Additionally, article VIII, section 2 of the Alaska Constitution specifies that the state legislature is responsible for "provid[ing] for the utilization, development, and conservation of all natural resources belonging to the State . . . for the maximum benefit of its people." The superior court spent little time analyzing this provision, however, because the court decided the case on statutory grounds.

DNR to regulate resource extraction.[58] And the borough regulations that the sponsors cite are not before us in this case; they would be subject to review if the State chooses to challenge them.

The legislature has granted DNR "charge of all matters affecting exploration, development, and mining of the mineral resources of the state."[59] Because the SOS Initiative allows — and in some cases requires — the Borough to prohibit mining projects that would otherwise be authorized by DNR, the initiative seriously impedes the regulatory process set forth by the Alaska Land Act and is therefore preempted by that statute.[60] Accordingly, the SOS Initiative cannot be enforced.[61]

---

[58] *Cf. Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) ("In contracts, as in statutes, where one section deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is a conflict, the specific section will control over the general." (quoting *In re Estate of Hutchinson*, 577 P.2d 1074, 1075 (Alaska 1978)) (internal quotation marks omitted)); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 185 (2012) ("[T]he [general/specific] canon does apply to successive statutes.").

[59] AS 27.05.010(a).

[60] Citing *Macauley v. Hildebrand*, the State also argues that home rule boroughs are *constitutionally* preempted from acting in the area of natural resource management without express authorization from the state legislature. *See* 491 P.2d 120, 122 (Alaska 1971); *see also* Alaska Const. art. VIII, § 2 ("The *legislature* shall provide for the utilization, development, and conservation of *all natural resources* belonging to the State, including land and waters, for the maximum benefit of its people." (emphasis added)); *accord Jefferson v. State*, 527 P.2d 37, 44 (1974) ("[When] the state constitution . . . vest[s] the legislature with pervasive control over [an area of law,] . . . home rule municipalities [are] precluded from exercising power [in that area] unless, and to the extent, delegated by the state legislature . . . ." (citing *Macauley*, 491 P.2d at 120-22)). Although the State makes a compelling argument that natural resource management is an area of "pervasive state authority" under the factors articulated in

(continued...)

## V.  CONCLUSION

We AFFIRM the judgment of the superior court.

---

**60**     (...continued)

*Macauley*, we do not need to reach this constitutional issue.

**61**     Pebble also argues that the SOS Initiative is invalid because it exceeds the borough assembly's power to legislate and because it improperly appropriates state assets in violation of article XI, section 7 of the Alaska Constitution.  Because we agree with the superior court's conclusion that the initiative is preempted by state statute, we do not need to reach these issues.